THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL D. HENDERSON, Defendant-Appellant.

Fourth District   No. 4—08—0558

Opinion filed September 23, 2009.

Michael J. Pelletier, Gary R. Peterson, and John M. McCarthy, all of State Appellate Defender's Office, of Springfield, for appellant.

Willliam A. Yoder, State's Attorney, of Bloomington (Patrick Delfino, Robert J. Biderman, and Anastacia R. Brooks, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Following a September 2007 trial, a jury convicted defendant,

Michael D. Henderson, of two counts of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(1) (West 2006)). In January 2008, the trial court sentenced defendant to 25 years in prison on count I and 40 years in prison on count II, ordering those sentences to run consecutively.

Defendant appeals, arguing that (1) the trial court erred by allowing the State to present evidence in the form of a "human lie detector" and, alternatively, (2) his penalty for his offense violates the proportionate-penalties clause of the Illinois Constitution. We affirm.

## I. BACKGROUND

In December 2006, the State charged defendant, in pertinent part, with two counts of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(1) (West 2006)), alleging that defendant attacked V.G., a then-20-year-old female college student, while threatening her with a knife.

At defendant's September 2007 jury trial, the State presented the following evidence. V.G. testified that in May 2006, around 9:30 p.m., she left her apartment to go for a walk in a nearby park. As she was walking, a man emerged from the parking lot of a nearby apartment complex—the Fox Hill Apartments. The man began to walk toward her, inquiring, "[H]ey, sweetheart, what's going on with you?" and "How's your night going?" V.G. responded, "please just leave me alone" and continued walking. The man pursued, walking in the same direction on the opposite side of the street.

Moments later, V.G. was tackled from behind, the impact forcing her to roll down a hill. A man placed his hand over her mouth and asked, "[W]hy are you disrespecting me? I just wanted to see how your day was?" She asked the man what he wanted. He responded by asking her whether she had money or other valuable items in her purse and telling her that he had a knife and that he would cut her. The man, while gripping the back of her neck, made V.G. hunch down and move toward a ditch further down the hill. As V.G. moved toward the ditch, the man—still gripping the back of her neck—stopped to urinate.

The man then ordered V.G. to get down. She complied, sitting with her legs straight out in front of her. The man proceeded to get down on his knees, straddling her outstretched legs. V.G. begged the man to leave her alone. The man then told her to lay back. V.G. complied, and he unbuckled her belt. She grabbed both sides of her belt, begging him again "not to do this." V.G. screamed and he punched her in the face. In response, she moved her hands from her belt to protect her face.

The man then knelt down and ordered her to kiss him. V.G. complied, all the while trying to avoid looking at him. He continued kissing her on the side of the neck and ear. The man then took off her left shoe and slid her pants and underpants completely off her left leg, leaving the garments halfway down her right leg. The man penetrated her. V.G. screamed again. The man responded by threatening to cut her, pressing an object against her neck. The man then ordered her onto her hands and knees and asked her, "Oral or anal?" V.G. responded, "Please, don't," but he penetrated her again.

After some time, V.G. noticed the headlights from a vehicle turning around in a nearby circle drive. The man also saw the lights and, in response, lifted her upright and covered her mouth, while he was still penetrating her. The man asked her again about the contents of her purse. At that point, V.G. decided to remove her other shoe and her pants from her right side so that when another vehicle came into view, she would be ready to run toward it.

When V.G. saw another set of headlights in the circle drive, she dug her toes into the ground and took off, running, screaming, and waving her arms. She screamed, "Help me, I was being raped." The driver let her onto the bed of his truck and moments later, another man—who had been fishing nearby—called the police.

The hospital's sexual-assault examiner testified that, in response to V.G.'s telling her that her attacker had kissed and licked her neck and ear, she took deoxyribonucleic acid (DNA) swabs of those areas, which the examiner included in the sexual-assault kit she provided to law enforcement. An Illinois State Police DNA analyst testified that the DNA on those swabs matched defendant's DNA on 26 of 26 genetic markers. The analyst explained that such a profile occurred in "approximately one in fifty-four quadrillion black[,] one in sixteen quintillion white, or one in eleven quintillion Hispanic unrelated individuals."

Detective Matthew Dick testified that he obtained the warrant that required defendant to provide a DNA sample, which the analyst later matched to the DNA swab taken from V.G.'s neck and ear. Dick explained that in May 2006, defendant lived at the Fox Hill Apartment complex. Dick also explained that he and another detective interviewed defendant at the police station. At that interview, defendant denied any involvement, adamantly denying that he had ever seen V.G. After questioning Dick about what defendant said during the interview, the prosecutor initiated the following exchange:

"[PROSECUTOR:] Now, [Dick], what kind of training have you received in interview techniques?

[DICK:] I have been to several different interview and interrogation schools. The Reid Technique. The Kenisic (phonetic) Interview Technique. Various others that are basically a modification of those two. But at least four or five different interview and interrogation schools.

[PROSECUTOR:] Now, in your training techniques, what, if anything, did you learn about vague responses?

[DICK:] I learned that vague responses can be indicators of deception. You know, they focus on just different things to look for. You know, body language, non[ ]verbal cues, stuff like that.

[PROSECUTOR:] Your responses that you received from *** [d]efendant during this interview, would you classify those as vague?

[DICK:] Yes.

[PROSECUTOR:] Non[ ]responsive?

[DICK:] Correct.

[PROSECUTOR:] General denial?

[DICK:] Correct.

[PROSECUTOR:] You mentioned body language. What are some of the characteristics that you are looking for when you are interviewing an individual in relation to this body language?

[DICK:] Well, people being in a surprise interview is a stressful situation regardless of the situation. So one of the first things you need to do is establish a baseline, observe the suspect and the types of physical behaviors he exhibits when, you know, innocuous questions are being asked; such as, his name, his date of birth, where he lives, those types of things. And then also observe any changes in those behaviors when you start asking more heated questions, when you start getting to the, you know, the meat of the matter, more accusatory type questions. It can be something as simple as a scratching of the nose or rubbing of the hands together, sweating, scratching, just psychological things that the body goes through when [it's] under stress. So stress defense mechanisms."

At that point, the prosecutor played a video of Dick's interview with defendant (without sound) and continued questioning Dick as follows:

"[PROSECUTOR:] While we're watching this[,] *** this is a depiction of the interview room; is that correct?

[DICK:] Yes.

[PROSECUTOR:] For a short period of time, *** [d]efendant was in there by himself; is that correct?

* * *

[PROSECUTOR:] Now, is that you?

[DICK:] Yes, that's me.

[PROSECUTOR:] The early portion of this interview that we're looking at now, this is where you were making your baseline; is that correct?

[DICK:] Correct.

[PROSECUTOR:] At this point, [defendant has] not been advised of the charges against him; is that correct?

[DICK:] No.

[PROSECUTOR:] Can you explain to the jury what's going on at this point?

[DICK:] [Defendant] has begun to sweat profusely and claiming how hot he is. Just a minute ago there, I offered to turn down the thermostat. Reached up and turned the thermostat down and gave him the opportunity to take his thermal shirt off, his long sleeve shirt.

[PROSECUTOR:] This was approximately after the confrontation with the DNA; is that correct?

[DICK:] Yes.

[PROSECUTOR;] What are you doing at this point ***?

[DICK:] Showing him a picture of the [v]ictim, [V.G.]

* * *

[PROSECUTOR:] His response on seeing the photograph was what?

[DICK:] Denial that he knows her. Denies that he has ever seen her. You can see he's using his shirt to wipe the sweat off of himself.

[PROSECUTOR:] Still sweating profusely at this point?

[DICK:] Yes. He's also moved to a defensive position here with his arms crossed. At the beginning of the interview, he had open posture and was leaning forward into me. Now he's leaning way back and arms crossed, avoiding eye contact. In a little bit here, he'll actually even pick the shirt up and hold it in his lap to act as another barrier."

Dick further testified that defendant, while in the county jail, made several telephone calls, apparently to a girlfriend, in which he admitted that he had had a confrontation with V.G. (The State played a portion of those recordings for the jury.)

Defendant did not testify, nor did he call any witnesses in his defense.

The jury thereafter convicted defendant of two counts of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(1) (West 2006)). In January 2008, the trial court sentenced defendant as previously stated.

This appeal followed.

## II. ANALYSIS

### A. Defendant's Claim That the Trial Court Erred by Allowing the State To Present Evidence in the Form of a "Human Lie Detector"

█ Defendant argues that the trial court erred by allowing the State to present evidence in the form of a "human lie detector." Specifically, defendant contends that the court should not have allowed the State to present Dick's testimony regarding defendant's body language during his interview as indicating deception. Because defendant failed to object to Dick's testimony regarding defendant's body language indicating deception (1) at trial or (2) in his posttrial motion, defendant has forfeited this issue on appeal. See *People v. Sorrels*, 389 Ill. App. 3d 547, 552, 906 N.E.2d 788, 793 (2009) (noting that the defendant had forfeited an issue on appeal because he failed to (1) object at trial to the testimony he was challenging on appeal or (2) include the issue in his posttrial motion).

Nonetheless, defendant asserts that his procedural default may be excused by the plain-error doctrine. A reviewing court may review an error under the plain-error doctrine if "(1) the evidence is closely balanced or (2) the error is 'so substantial that it affected the fundamental fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process.' " *People v. Hostetter*, 384 Ill. App. 3d 700, 707, 893 N.E.2d 313, 319 (2008), quoting *People v. Hall*, 194 Ill. 2d 305, 335, 743 N.E.2d 521, 539 (2000). However, prior to addressing whether Dick's testimony constituted plain error, we will determine whether his testimony constituted error at all. *Sorrels*, 389 Ill. App. 3d at 553, 906 N.E.2d at 793.

In *United States v. Williams*, 133 F.3d 1048 (7th Cir. 1998), the Seventh Circuit rejected the type of testimony presented by the State in this case. In *Williams*, the government introduced its special agent to testify about how the defendant's body language indicated deception—that is, the government introduced a human lie detector. *Williams*, 133 F.3d at 1053. In rejecting this type of testimony, the court concluded as follows:

> "The admission of this testimony also presents some concerns. After the government agent or police detective has just informed a person in custody that he has been identified as a suspect *** and explained to him that the police have no doubt that he is the defendant, what person would not be nervous, agitated, and unwilling to make eye contact with his investigator? Williams denied that he participated in the robbery, yet [the special agent] purports to be a human lie detector in observing Williams' demeanor. These observations are improper characterizations of the defendant and

useless in the determination of innocence or guilt \*\*\*." *Williams*, 133 F.3d at 1053.

We agree with the Seventh Circuit, particularly about the uselessness of this testimony, given that it amounts to nothing more than inadmissible opinion testimony by the officer that defendant's story was not true.

Nonetheless, in this case, the evidence was not closely balanced, nor was the admission of this improper evidence so serious that it affected the fairness of defendant's trial or the integrity of the judicial process. The State presented the following overwhelming evidence of defendant's guilt: (1) defendant, at the time of the attack, lived at the Fox Hill Apartments—the apartment complex from which V.G.'s attacker emerged; (2) defendant's DNA matched the DNA on the swabs taken from V.G.'s neck and ear immediately following the attack; and (3) defendant, after initially telling investigators that he had never met V.G., admitted, in a series of jailhouse phone conversations, that he had a confrontation with V.G. the day of the attack. Defendant did not rebut this evidence. In short, the evidence in this case was hardly closely balanced.

Moreover, although we are mystified as to why the prosecutor chose to present improper opinion testimony about defendant's body language, this testimony did not affect the fairness of defendant's trial or challenge the integrity of the judicial process. Dick's testimony regarding defendant's body language is not close to being as prejudicial as would evidence about a traditional "lie detector." Regarding the latter, the concern is that the jury might be influenced by the quasi-scientific basis upon which the lie detector is alleged to be based. See *People v. Gard*, 158 Ill. 2d 191, 201, 632 N.E.2d 1026, 1031 (1994) (concluding that the results of polygraphs are generally inadmissible and noting that "[b]ecause the results of polygraph examinations appear to be quasi-scientific, jurors are likely to give such results undue weight"). Conversely, when, as in this case, the so-called "lie detector" consists of nothing more than another person's opinion regarding truthfulness, the prejudicial impact is reduced significantly, given that the traditional function of the jury is to judge witness credibility, as the trial court instructed the jury in this case and is supposed to so instruct a jury in all criminal cases. See Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000).

The distinction between polygraphs and "human lie detectors" notwithstanding, Dick's testimony regarding defendant's body language was useless in the determination of guilt or innocence. An investigator's testimony should be presented only to communicate what was said during an interrogation. Using such a witness as a "hu-

man lie detector" goes against the fundamental rule that one witness should not be allowed to express his opinion as to another witness's credibility. See *People v. Simpkins*, 297 Ill. App. 3d 668, 682-83, 697 N.E.2d 302, 311 (1998) (rejecting the testimony of an expert as to the reliability of child victims). While the prejudicial impact of Dick's testimony was not great, it was devoid of probative value. This being so, we expect that we will not see any repeat performances by this prosecutor, and human lie detectors will not be used in the future.

### B. Defendant's Claim That the Penalty for His Offense Violates the Proportionate-Penalties Clause of the Illinois Constitution

■ Defendant next argues that the penalty for his offense violates the proportionate-penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, §11). Specifically, defendant contends that the penalty for aggravated criminal sexual assault while armed with a knife (720 ILCS 5/12—14(a)(1) (West 2006)) violates the proportionate-penalties clause because that crime contains the same elements as the crime of armed violence with a category II weapon predicated upon criminal sexual assault (720 ILCS 5/33A—1(c)(2), 33A—2(a), 33A—3(a—5) (West 2006)) but carries a harsher penalty. We disagree.

"The proportionate[-]penalties clause of the Illinois Constitution requires the legislature to determine a penalty according to the seriousness of the offense, and with the objective of restoring the offender to useful citizenship." *People v. McCarty*, 223 Ill. 2d 109, 136, 858 N.E.2d 15, 32 (2006). To demonstrate that an offense violates the proportionate-penalties clause, a defendant must argue that the penalty for that offense is (1) "cruel and degrading" or (2) more severe than the penalty for an offense with identical elements. *McCarty*, 223 Ill. 2d at 137, 858 N.E.2d at 33.

The elements of aggravated criminal sexual assault are achieved when an accused (1) commits a criminal sexual assault (2) while displaying, *threatening to use*, or using (3) a dangerous weapon other than a firearm—such as a knife. 720 ILCS 5/12—14(a)(1) (West 2006). The elements of armed violence with a category II weapon predicated upon criminal sexual assault are achieved when an accused (1) commits criminal sexual assault (2) *while armed* with (3) a category II weapon—such as a knife. 720 ILCS 5/33A—1(c)(2), 33A—2(a) (West 2006).

The plain language of these statutes reveals that their elements are not identical. That is, an accused could commit aggravated criminal sexual assault by committing sexual assault, while threatening to use—although not actually armed with—a knife. Such an act would not substantiate a charge of armed violence with a category II weapon

predicated upon criminal sexual assault because the accused would not have been armed. Accordingly, the penalty for aggravated criminal sexual assault does not violate the proportionate-penalties clause of the Illinois Constitution.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

Affirmed.

McCULLOUGH, P.J., and MYERSCOUGH, J., concur.