2015 IL App (4th) 130358

NO. 4-13-0358

FILED
March 11, 2015
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| ANTHONY L. O'DONNELL, | ) | No. 12DT504 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John R. Kennedy, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE POPE delivered the judgment of the court, with opinion.
Justices Knecht and Holder White concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a jury trial, defendant, Anthony L. O'Donnell, was convicted of driving under the influence of alcohol. 625 ILCS 5/11-501(a)(2) (West 2012). The trial court sentenced defendant to 24 months' probation and 90 days' incarceration in the Champaign County correctional center. Defendant appeals, arguing he is entitled to a new trial under the first prong of the plain-error doctrine because (1) the trial court impermissibly allowed a police officer to testify as a "human lie detector," and (2) the evidence in his case is closely balanced. We affirm.

¶ 2                          I. BACKGROUND

¶ 3 On September 9, 2012, following a traffic accident in Mahomet, Illinois, defendant was arrested for driving under the influence of alcohol. 625 ILCS 5/11-501(a)(2) (West 2012). A jury trial was held in February 2013.

¶ 4                     A. Detective Beckett's Testimony

¶ 5       Detective Kevin Beckett of the Mahomet police department testified first for the State. Beckett testified he responded to a car accident at approximately 12:46 a.m. and no driver was found at the scene. At 1:12 a.m., he was notified by the local fire department an individual had been located walking approximately one mile away. Beckett proceeded to that location, where he found defendant.

¶ 6       Beckett testified defendant told him a friend had been driving his car, he had been a passenger, and after the crash, he exited the car to go to a business district to find a way home. Beckett stated, at the time he located defendant, defendant was not near a business district, but was walking deeper into a residential area.

¶ 7                      B. Detective Bragg's Testimony

¶ 8       Arresting officer Rebecca Bragg of the Mahomet police department testified next for the State. Bragg testified she was dispatched to a traffic accident on Tin Cup Road. She stated she observed skid marks across the road and a crashed vehicle in a bean field. She identified the vehicle as a white Grand Prix and testified the outside of the vehicle was damaged—the hood was crushed, the mirrors were broken, the front windshield was shattered, and the passenger's side window was "busted out." Bragg testified she observed both the driver's side and passenger's side air bags had been deployed. She stated the driver's side air bag looked like it had been tampered with and pushed in between the handles of the steering wheel. Bragg also observed a cushion and cell phone on the driver's seat and miscellaneous items on the passenger's seat. She explained the passenger's side air bag appeared not to have been tampered with and there was a path from the car through the bean field, leading away from the road, where it appeared someone had walked and broken the beans. In Bragg's opinion, the accident occurred when "the driver was going entirely too fast, couldn't make the curve, went off the roadway, tried

to overcorrect the steering, and causing [*sic*] them to skid, and it collided with a fire hydrant, which caused the car to flip and roll."

¶ 9 Bragg testified she spoke with defendant, the registered owner of the car, after her assisting officer brought him back to the scene. According to Bragg, defendant explained he left his residence at approximately 6 p.m. and went to a friend's house for a couple of hours. He then went to Uncle Buck's Sports Bar and Grill (the bar), where he played five or six games of pool with three or four different individuals. Bragg stated defendant could not describe or name any of the people he played pool with, except for one, "John." Bragg testified she asked defendant about his alcohol consumption, and defendant admitted he drank "approximately five, twelve-ounce Busch can beers" and was too drunk to drive. Defendant told Bragg he was ready to leave the bar and talked to the man he had just met playing pool, John, who told defendant he would drive defendant's car to an address on Prairie View Road. Defendant told Bragg he was not sure where that location was.

¶ 10 Bragg testified defendant told her John was driving too fast and he told him to slow down. He then explained, once the car went off the roadway, he closed his eyes and did not open them until after the car landed. When he opened his eyes, John was not in the vehicle. Defendant then told Bragg the car doors would not open, so he crawled out the passenger's side window and started walking to try to find a business area so he could call a friend. Bragg testified defendant went in the opposite direction of a business area after the accident.

¶ 11 The only information defendant could give Bragg about John was he was a male, about 6 feet 2 inches tall, and wearing shorts and a T-shirt. Bragg testified after defendant said he had gone looking for help, she asked defendant if he had a cell phone. Defendant responded

he had one on his person while he was at the bar, but he did not have it on him any longer.  The following exchange between the State and Bragg then occurred:

"Q.  While you were questioning the defendant at this time, did he admit that he was driving the car?

A.  No.

Q.  Okay.  What did he do instead?

A.  When I would ask him questions, he would show deception.  When I would ask him about certain things that would reflect him being the driver, he would always look away from me, or look down, and he would just state, 'I wasn't the driver.'

Q.  Based on your experience and training, is that a common tactic when somebody's lying?

A.  Yes, it's a sign of deception when someone won't look at you, when they look away to answer you.

Q.  Okay.  When you asked the question—or excuse me, when you asked the defendant questions about the car accident, did you specifically ask him where he was sitting?

A.  I did.

Q.  What did he tell you?

A.  He told me he was sitting on his cushion.

Q.  Where was that cushion?

A.  In the driver's seat.

Q. When you—when he answered that question, what did
he do?

A. He looked away, and looked down.

Q. And did you again ask the defendant about his alcohol
use or consumption?

A. I did.

Q. And do you remember what he told you?

A. At that time he just said that—any time I would ask him
something about reflecting being the driver, he would simply say
he wasn't a driver, because he was too drunk."

Bragg testified she asked defendant to submit to a field sobriety test, to which he responded no, because he was not the driver. She then asked him to submit to a breath test, to which he again responded no, because he was not the driver.

¶ 12      At that time, defendant was placed under arrest and read his *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436 (1966). Bragg testified defendant answered more questions after his arrest and his "story changed quite a bit." Defendant stated he left his residence around 4 p.m. and went straight to the bar, but he also stated he did not arrive at the bar until 6 p.m. He stated he played pool with several different individuals but could only remember John because "he played pool better than anybody else." Defendant told Bragg John needed a ride home, so he allowed John to drive his car. His version of the accident at this point remained consistent; John was driving too fast, he told John to slow down, the car crashed, and when he opened his eyes, John was gone. The State then asked:

- 5 -

"Q. And officer, again, what was the defendant's demeanor like during this conversation?

A. It was the same, showing deception. Sometimes I would ask him questions that I already knew the answer to, that he would not show deceptioin [*sic*]. He was looking at me perfectly fine and would answer those, and when it came to proving that he was the driver, or even when I would state that he was the driver, he would look away from me, or look down."

¶ 13    On cross-examination, Bragg testified the police and local fire department had looked for John, but he was never found. She stated the bar was closed by the time she got back to town, so she was unable to confirm whether John had ever been there. Bragg testified no further investigation was conducted to determine John's identity or his whereabouts because she had concluded defendant was the driver.

¶ 14                    C. Photographic Evidence

¶ 15    Bragg authenticated several photographs she had taken of the scene and vehicle, which were admitted into evidence. The photographs depict the damage to the outside of the vehicle and the area where the accident occurred. The roof of the vehicle is smashed, the driver's side door is closed, and the beans surrounding the driver's side of the vehicle appear to be undisturbed. The passenger's side door is closed and has a "busted out" window. The beans surrounding the passenger side of the vehicle appear to be smashed down and broken. A cushion is on the driver's seat and the driver's side air bag is tucked into the steering wheel. Defendant's cell phone is sitting on the driver's seat behind the cushion. Two towels sitting on the

passenger's seat covered several pieces of paper, an ashtray, and other miscellaneous items on the passenger's seat.  The deflated passenger's side air bag looks undisturbed.

¶ 16                                D. Defendant's Testimony

¶ 17            Defendant testified on his own behalf and stated he lives in Mansfield, Illinois. When defense counsel asked defendant how he would drive if he were traveling from Mansfield to Mahomet, defendant stated he would take "150 eastbound."  On the night in question, defendant testified he went to the bar with a friend for a barbeque cook-off.  He explained the bar had a board where people could write their names and he ended up shooting pool with "four or five, six different guys."  Defendant admitted he had been drinking.  When asked about leaving the bar, defendant stated:

> "One of the guys I'd been shooting pool with, John, had
>
> asked me for a ride home, and I told him that I was not going to be
>
> driving home, because I was intoxicated.  And he said 'Well, I'm
>
> not.  Will you let me drive your car?'  And I was just going to leave
>
> my car at the post office of [*sic*] Candlewood Estates, which was
>
> his destination.  And I was going to call and get a ride from there,
>
> because I had shot pool with him that night, often, and I had won
>
> some money off of him.  So I thought, if anything, I would let him,
>
> you know, get a ride home that night from me."

Defendant explained he had just met John that evening, had been playing pool with him for three or four hours, and was being friendly toward him by letting him use his car.  Defendant then testified, in order to get to Tin Cup Road from the bar, you would have to be driving away from U.S. 150, opposite of the direction in which he lived.

¶ 18    Defendant maintained John was driving too fast and he told him to slow down. He testified he felt the car "swerving sideways" and closed his eyes. He explained the car "endoed, (phonetic spelling) not rolled" and landed back on all four wheels. The State asked defendant how he got out of the vehicle. Defendant responded:

"Well, I tried to open up the passenger door, and it would not open. The glass was shattered on the passenger side window. This was after he had gotten out, and he had made a comment of why he was exiting the car and not sticking around. And that upset me, but nothing I could do about it, because he was getting out, and I'm, you know, in the passenger seat, and I can't get out and open the door. So I ended up getting out the driver's door, and he was long gone, and I was running back to [the bar] to use the phone."

Defendant explained he did not use his cell phone to call anyone because he did not know where anything was located and he could not see anything because there was no light working in the car.

¶ 19    Defense counsel then asked defendant about Bragg's testimony that he had told her he was sitting on his cushion at the time of the accident. Defendant explained, "When I drive the car I sit on a cushion in the driver's seat. When she asked me that question, I wasn't certain of the tense of the question as to when I drive the car, or when the car was just driven to the scene." He further explained he never mentioned John's comment to Bragg because, "at the time it didn't matter what he said. It was just the fact that he exited the car as quick as he did and was gone, knowing that he was responsible for the accident."

¶ 20	On cross-examination, the State verified the bar had a board where people could write their names when they were playing pool, but the only name defendant remembered from the entire evening was John. Next, the State asked defendant why he did not call anybody from the bar to come pick him up. Defendant stated he was going to let John give himself a ride home. The State asked, "But that didn't secure your transportation from John's house to the next location, your house, right?" Defendant responded, "Well, I would have—I was sure that the person I was calling would have—I would have been calling my roommate." He then acknowledged he had not called his roommate from the bar.

¶ 21	The State then questioned defendant about the events that occurred directly after the accident.

"Q. *** So you indicated during this car accident you closed your eyes?

A. Yes.

Q. And you didn't black out?

A. I didn't have any reason to feel that I had, or would.

Q. And you told Officer Bragg *** that when you opened your eyes, you were in the *** bean field, and John wasn't in the car any more [*sic*]; is that correct?

A. Yes.

Q. All right. You didn't tell Officer Bragg that *** John left the car. You told her he wasn't there when you opened your eyes.

A. Well, when I said that I wasn't the driver, when I opened my eyes, and there was nobody else in the car, that's—that means somebody else was driving the car, which I have always said.

Q. You closed your eyes, and when you opened them, nobody else was in the car, okay.

A. (No audible response)

Q. When you closed your eyes, John would have had to crawl over you in order to get out of the car?

A. I don't know why he would have had to crawl over me. The driver's door opened up. The passenger door would not open. That's why I wasn't able to exit out the passenger front door."

Defendant testified he had not told Bragg he exited the vehicle through the passenger's side window. He stated he climbed over the center console and exited the vehicle through the driver's side door. He stated he did not recall the exact steps he took—whether he had walked toward the road or through the bean field—but he was walking back to the bar to use the phone.

¶ 22                 E. Detective Bragg's Rebuttal Testimony

¶ 23       The State recalled Bragg to the witness stand and asked if she had tried to gain entry to the vehicle when she arrived at the scene of the accident. Bragg answered yes and explained she had tried to open all of the vehicle's doors but none of them would open.

¶ 24                 F. The Verdict and Sentence

¶ 25    After presentation of the evidence, the jury found defendant guilty of driving under the influence of alcohol. In April 2013, the court sentenced defendant to 24 months' probation and 90 days in jail.

¶ 26    This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28    Defendant argues he was denied a fair trial because the State was allowed to present evidence in the form of a "human lie detector." Specifically, defendant contends the court should not have allowed Bragg to testify regarding her belief defendant was lying when he stated he had not been driving his vehicle at the time of the accident. We initially note defendant has forfeited review of this issue because he failed to object both at trial and in a posttrial motion. See *People v. Sorrels*, 389 Ill. App. 3d 547, 552, 906 N.E.2d 788, 793 (2009) (holding a defendant forfeits an argument for appeal when he fails to object at trial or raise the issue in a posttrial motion).

¶ 29    Nonetheless, a reviewing court may consider unpreserved error when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010). "In both instances, the burden of persuasion remains with the defendant." *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 480 (2005). Defendant argues he is entitled to a new trial under the closely balanced evidence prong. Our first step is to determine whether an error occurred at all. *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010).

¶ 30                    A. Bragg's Testimony About Defendant's Deception

¶ 31            Defendant contends the trial court erred when it allowed Bragg to testify defendant's body language during his interview indicated he was being deceptive. Defendant specifically argues, like a polygraph, Bragg was purporting to determine he was lying when he stated he was not driving his car at the time of the accident and such testimony is inadmissible. We agree.

¶ 32            In *People v. Henderson*, 394 Ill. App. 3d 747, 753, 915 N.E.2d 473, 478 (2009), we explained the uselessness of "human lie detector" testimony. There, a police officer was allowed to testify at trial a defendant's vague responses and body language during his interrogation indicated he was being deceptive. *Id.* at 749-51, 915 N.E.2d at 475-77. A videotape of the interrogation was played for the jury and the officer was allowed to point out the segments where he believed the defendant was lying. *Id.* The defendant chose not to testify or call any witnesses on his behalf. *Id.* at 751, 915 N.E.2d at 477. On appeal, we concluded the testimony was inadmissible. We explained, "An investigator's testimony should be presented only to communicate what was said during an interrogation. Using such a witness as a 'human lie detector' goes against the fundamental rule that one witness should not be allowed to express his opinion as to another witness's credibility." *Id.* at 753-54, 915 N.E.2d at 478.

¶ 33            The State contends the instant case is distinguishable from *Henderson* because, here, defendant testified on his own behalf and disputed Bragg's testimony concerning whether he was driving. The State further contends the testimony in this case was "much briefer" than the testimony presented in *Henderson*. We agree there are some factual differences. The testimony presented by the officer in *Henderson* was much more extensive than the testimony presented by Bragg in this case. Nonetheless, we conclude Bragg's testimony, like the officer's

- 12 -

testimony in *Henderson*, was "inadmissible opinion testimony by the officer that defendant's story was not true." *Id.* at 753, 915 N.E.2d at 478. Bragg specifically testified, "When I would ask [defendant] about certain things that would reflect him being the driver, he would always look away from me, or look down ***. *** [I]t's a sign of deception when someone won't look at you, when they look away to answer you." As the Seventh Circuit explained in *United States v. Williams*, 133 F.3d 1048, 1053 (7th Cir. 1998), "[t]hese observations are improper characterizations of the defendant and useless in the determination of innocence or guilt, and in fact, they tend to prejudice the jury. It is [defendant's] denial of guilt that is important and not the manner in which he communicates it." Accordingly, we conclude the trial court erred when it allowed this form of testimony.

¶ 34                                    B. Plain-Error Review

¶ 35          Because we conclude error occurred in this case, we must next determine whether the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *Sargent*, 239 Ill. 2d at 189, 940 N.E.2d at 1058. In order for the jury to have found defendant guilty of driving under the influence of alcohol, the State was required to prove (1) defendant was intoxicated; and (2) while intoxicated, defendant was driving a vehicle. See 625 ILCS 5/11-501(a)(2) (West 2012).

¶ 36          Defendant argues the evidence in his case is closely balanced because the State's evidence on the question of whether he was driving at the time of the accident was weak. He specifically argues (1) no one saw him driving; (2) he consistently denied he was driving; and (3) no independent evidence established he was driving. We disagree.

¶ 37          As a reviewing court, we must make a "commonsense assessment" of all the evidence in context when reviewing a claim under the first prong of the plain-error doctrine.

*People v. White*, 2011 IL 109689, ¶ 139, 956 N.E.2d 379.  For example, in *People v. Adams*,

2012 IL 111168, 962 N.E.2d 410, two police officers testified they searched a defendant

pursuant to a traffic stop and recovered a bag of cocaine from his shirt pocket.  *Id.* ¶¶ 5, 12, 962

N.E.2d 410.  The defendant testified on his own behalf and maintained throughout trial the drugs

did not belong to him.  *Id.* ¶¶ 8-11, 962 N.E.2d 410.  The supreme court explained the

defendant's testimony as follows:

> "A piece of paper or plastic with cocaine on it was sitting in a
>
> parking lot.  Although unsecured in any way, the cocaine powder
>
> had not been disturbed by wind, weather or traffic.  By
>
> coincidence, defendant parked his car next to the cocaine.  In a
>
> further coincidence, after defendant was approached by the police,
>
> he was escorted to and searched in a spot only inches from the
>
> cocaine.  Then, when [the police officer] discovered the cocaine on
>
> the ground, he conspired on the spot to attribute the drugs to
>
> defendant in an apparent attempt to pressure defendant to provide
>
> information about other crimes, though there was no indication that
>
> the police had ever met defendant or would have reason to believe
>
> that he possessed such information."  *Id.* ¶ 22, 962 N.E.2d 410.

The court ultimately found the evidence against the defendant overwhelming, stating,

"defendant's explanation of events, though not logically impossible, was highly improbable."  *Id.*

¶ 38        Looking at the evidence here in a commonsensical manner, we conclude

defendant's explanation of events was highly implausible.  Defendant, the registered owner of the

vehicle involved in the accident, admittedly drove his car *to* the bar.  He admittedly became

intoxicated. However, he claims he was not driving his vehicle at the time of the accident because he let a man he did not (and still does not) know drive his vehicle—a man who, after crashing the vehicle, conveniently immediately disappeared and was never found. In one version of events, defendant opened his eyes and John was gone. In another version, John explained to defendant he was not going to "stick around" and *then* he was gone.

¶ 39      Defendant claims he consistently denied he was driving, yet several inconsistencies appear in defendant's explanation of the accident. Among these inconsistencies are defendant (1) initially told Bragg he was sitting on his cushion (which was found in the driver's seat) at the time of the accident but later claimed he misunderstood the tense of her question; (2) initially told Bragg he exited the car through the passenger's side window but later claimed he exited through the driver's side door (even though Bragg testified none of the doors would open); and (3) testified he was walking back to the bar to use the phone but was found walking deeper into a residential area away from the road. Defense counsel explicitly recognized these inconsistencies at trial but stated defendant had "tried to explain [them] away" during his testimony.

¶ 40      To support his claim he was not driving, defendant placed emphasis at trial on the fact the police quit looking for John. However, Bragg testified both the police and the local fire department had searched the area surrounding the accident and the only person located was defendant. She further testified defendant told her he was sitting on his cushion at the time of the accident, he opened his eyes and John was not in the vehicle, and the doors would not open so he had to crawl out the passenger's side window. Bragg explained she located defendant's cushion in the driver's seat, noticed only one footpath from the car through the bean field, and had unsuccessfully attempted to open all of the vehicle's doors.

¶ 41    Defendant admitted he never blacked out, yet when the State asked defendant at trial whether his initial statement and Bragg's testimony meant John had to crawl over him to exit the vehicle, defendant claimed both he and John exited the vehicle through the driver's side door. He did not dispute the doors to the vehicle would not open for Bragg, he simply could not explain it.

¶ 42    Inconsistent and conflicting testimony aside, when we view the photographs taken of the scene, we see defendant's wrecked vehicle sitting in a bean field. The doors to the vehicle are closed, the passenger's side window is "busted out," and the roof is completely smashed into the frame. The rows of beans near the driver's side door appear completely undisturbed, while the beans on the passenger's side are visibly trampled and broken. Defendant's cushion and cell phone are sitting in the driver's seat, and several random items, including papers, an ashtray, and two towels, are sitting in the passenger's seat. The driver's side air bag was stuffed into the openings of the steering wheel, and the passenger air bag appeared undisturbed. These photographs were admitted into evidence and the jury was free to examine them and form its own conclusion as to which version of the story it believed was accurate and which witnesses it believed were credible. See *People v. Ware*, 407 Ill. App. 3d 315, 357, 943 N.E.2d 1194, 1230 (2011) (finding the evidence against defendant overwhelming where the admission of photographic evidence allowed the jury to "corroborate or contradict the different versions of what occurred").

¶ 43    In short, the State presented testimony from two police officers and several photographs of the accident scene to support its position defendant was guilty of driving under the influence of alcohol. Defendant, on the other hand, repeatedly admitted he had been drinking but claimed he was not in physical control of his vehicle at the time it exited the roadway and

crashed into a bean field. His only support for this contention was an incredible story about a man named John who basically evaporated into thin air following the accident. The jury was not obligated to accept defendant's account merely because it was possible. *People v. Evans*, 209 Ill. 2d 194, 212, 808 N.E.2d 939, 949 (2004). Indeed, given the photographic evidence and defendant's admitted inconsistencies, we find it very likely the jury rejected defendant's version of events. Absent any other explanation and based on the record before us, we cannot say the evidence was so closely balanced that Bragg's improper testimony tipped the scales of justice against defendant. Thus, we cannot find plain error.

¶ 44       Lastly, we note the State did not refer to Bragg's opinion regarding defendant's deception during closing arguments. Thus, this inadmissible testimony was not highlighted or emphasized to the jury. This is not to say we condone the actions of the State in introducing this type of evidence. We addressed this issue clearly in our *Henderson* decision in 2009. We trust we will not have to address it again.

¶ 45                                III. CONCLUSION

¶ 46       For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002(a) (West 2012).

¶ 47       Affirmed.