The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
March 21, 2019

## 2019COA39

## No. 17CA0397 *People v. Murphy* — — Evidence — Opinions and Expert Testimony — Opinion Testimony by Lay Witnesses

In this direct appeal of a defendant's convictions for one count

of distributing methamphetamine to a minor and one count of

contributing to the delinquency of a minor, a division of the court of

appeals considers whether a lay witness may provide testimony

interpreting a witness's body language.

The division determines that, pursuant to CRE 701 and

*Venalonzo v. People*, 2017 CO 9, ¶ 22, 388 P.3d 868, 875, the trial

court abused its discretion in allowing a police officer testifying as a

lay witness to use his training and experience to interpret a

witness's body language.

Accordingly, the division reverses and remands to the district

court for a new trial.

COLORADO COURT OF APPEALS                                    **2019COA39**

Court of Appeals No. 17CA0397
Mesa County District Court No. 16CR92
Honorable Lance Phillip Timbreza, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Justine Lynn Murphy,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE TAUBMAN
Tow, J., concurs
Berger, J., specially concurs

Announced March 21, 2019

Philip J. Weiser, Attorney General, Megan C. Rasband, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph Paul Hough, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Justine Lynn Murphy, appeals her judgment of conviction entered on a jury verdict finding her guilty of distributing methamphetamine and contributing to the delinquency of a minor. She contends that the district court erred in permitting unendorsed and unqualified expert testimony under the guise of lay opinion, and that this testimony improperly commented on the meaning of the body language of K.H., a prosecution witness.  We reverse and remand for a new trial.

## I.  Background

¶ 2    K.H., then fifteen, attended a concert with his thirty-five-year old stepsister, Murphy, in January 2016.  The following day, K.H. met with his middle school counselor and assistant principal after one of his teachers expressed concern because K.H. appeared ill. K.H. disclosed to the counselor that he had used methamphetamine the night before while partying with Murphy before the concert. When the counselor asked K.H. if his sister "was a good person to be hanging out with," he responded, "no[,] because his sister does meth and his stepmom uses heroin."  School officials searched K.H.'s backpack and discovered drug paraphernalia and a small amount of methamphetamine.  They contacted K.H.'s father, J.H.,

1

and asked him to pick K.H. up from school. Thereafter, K.H. was admitted to the local hospital for evaluation and recovery.

¶ 3    School officials also contacted a school resource officer, Deputy Chad Searcy, regarding the information K.H. had offered about his stepsister. Based on this information, Deputy Searcy identified Murphy through law enforcement records and investigative techniques.

¶ 4    After notifying both J.H. and K.H. that K.H. was not under arrest and could cease the deputy's questioning at any time, another school resource officer, Deputy Mark Johnson, interviewed K.H. from his hospital bed in the presence of J.H. Deputy Johnson testified at trial that, when he asked where K.H. obtained the methamphetamine, K.H. was not immediately forthcoming. In response, Deputy Johnson asked, "Did you get it from [Murphy]?" K.H. "did not deny right away. Instead, his body language changed. He looked — had been looking at me as I was speaking to him. He looked down and away." Deputy Johnson testified that he assumed, based on his training and experience, that K.H. did not want to answer him and that the body language suggested an affirmative answer. Deputy Johnson then asked K.H. if Murphy

sold it to him or gave it to him. K.H. stated, "She sells it to me." J.H. terminated the interview before Deputy Johnson could inquire about the transaction.

¶ 5    Based on Deputy Searcy's identification of Murphy, law enforcement officers searched Murphy's home and found drug paraphernalia.

¶ 6    In an interview conducted approximately nine months later, in October, K.H. changed his story, telling Deputy Searcy that he had procured the methamphetamine from a dealer friend he encountered in the bathroom at the concert, and that he had injected it before attending school the next morning. At trial, the court admitted recorded jail phone calls Murphy made to her mother, who said, "[K.H.] swears sometimes that you did [give him the methamphetamine], then other times he says no. I almost had [K.H.] convinced to just right [sic] the letter saying he was lying because he was scared."

¶ 7    Murphy's theory of defense was that law enforcement officials had conducted an inadequate investigation by improperly focusing their investigation on her. She further contended that Deputy Searcy's questioning in October was the first time a law

3

enforcement officer had asked K.H. where he had acquired the drugs, claiming that K.H. consistently said he had obtained the methamphetamine from someone he ran into at the concert. K.H. testified at trial that he had not purchased the drug from Murphy and had never said otherwise. Deputy Johnson testified that, based on his training and experience,[1] he believed that K.H.'s body language indicated he was being deceptive when he looked down and away in response to a question.

¶ 8     The jury found Murphy guilty of distributing methamphetamine and contributing to the delinquency of a minor. She was sentenced to eight years in the custody of the Department of Corrections.

---

[1] The defense filed a pretrial motion objecting to Deputy Johnson's testimony as an expert in the field of "witness interviewing," stating that his testimony about K.H.'s body language was expert testimony that "could only be gleaned through official training and not through experience alone," and the evidence did not establish that he had expertise in the field. After the People responded, the trial court ruled that Deputy Johnson's testimony about K.H.'s body language was "really lay witness testimony" and "the endorsement was done in an abundance of caution." Thus, when the defense objected to the testimony at trial, the court overruled the objection, declaring that "pursuant to the court's order . . . this was proper lay opinion testimony, so [the defense] [doesn't] have to establish that he's an expert."

## II. Standard of Review

¶ 9 We review a trial court's evidentiary decisions for an abuse of discretion. *People v. Dunlap*, 975 P.2d 723, 741 (Colo.1999). A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misinterprets or misapplies the law. *Id.*; *People v. Ortiz*, 2016 COA 58, ¶ 14, 381 P.3d 410, 413.

¶ 10 If we determine the trial court abused its discretion, we reverse only "if the error affects the substantial rights of the parties." *Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119. In other words, "we reverse if the error 'substantially influenced the verdict or affected the fairness of the trial proceedings.'" *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

## III. Lay Witness Testimony

¶ 11 Murphy contends that the trial court erred in permitting Deputy Johnson to interpret the meaning of K.H.'s body language because his testimony was inadmissible under CRE 701. We agree.

### A. Applicable Law

> [T]he critical factor in distinguishing between lay and expert testimony is the basis for the witness's opinion. That is, the proper inquiry is not whether a witness draws on her personal experiences to inform her testimony;

5

> all witnesses rely on their personal experience
> when testifying.  Rather, it is the nature of the
> experiences that could form the opinion's basis
> that determines whether the testimony is lay
> or expert opinion. . . .  To determine whether
> the testimony in question is testimony that an
> ordinary person could give, "courts consider
> whether ordinary citizens can be expected to
> know certain information or to have had
> certain experiences."  Expert testimony, by
> contrast, is that which goes beyond the realm
> of common experience and requires
> experience, skills, or knowledge that the
> ordinary person would not have.

*Venalonzo v. People*, 2017 CO 9, ¶ 22, 388 P.3d 868, 875 (citations omitted) (quoting *People v. Rincon*, 140 P.3d 976, 982 (Colo. App. 2005)); *see* CRE 701.

¶ 12    The *Venalonzo* court held that "in determining whether testimony is lay testimony under [CRE] 701 or expert testimony under CRE 702, the trial court must look to the basis for the opinion." *Id.* at ¶ 2, 388 P.3d 868, 870-71.  The *Venalonzo* court concluded that, while an interviewer's testimony describing child interview techniques and general child behaviors constituted proper lay witness testimony, testimony explaining that children often use hand gestures "to demonstrate where on their bodies they were touched," coupled with a statement that the victim had engaged in

6

this behavior, was improper. *Id.* at ¶ 29, 388 P.3d at 876. The supreme court deemed the latter statements improper because the interviewer "attached significance to the victims' behavior that an ordinary person would not recognize." *Id.*

¶ 13    In *People v. Ramos*, a companion case, the supreme court determined that a detective's testimony — based on his training and experience — differentiating blood cast-off from blood transfer was expert testimony in the guise of lay testimony. 2017 CO 6, ¶ 9, 388 P.3d 888, 891. The court reasoned that the detective's testimony involved technical areas not within an ordinary person's experience or knowledge and concluded that the People improperly relied on it without seeking to qualify the detective as an expert. *Id.*; *see* CRE 702.

¶ 14    A lay witness may express an opinion of another person's behavior "if the witness had sufficient opportunity to observe the person and to draw a rational conclusion about the person's state of mind; an opinion that is speculative or not based on personal knowledge is not admissible." *People v. Jones*, 907 P.2d 667, 669 (Colo. App. 1995).

¶ 15 However, when a witness testifies based on his or her "training and experience," courts generally conclude that the witness provided expert testimony. *See, e.g., People v. Kubuugu*, 2019 CO 9, ¶ 16, 433 P.3d 1213, 1217-18; *Ramos*, ¶ 9, 388 P.3d at 891; *People v. Veren*, 140 P.3d 131, 137 (Colo. App. 2005); *cf. Venalonzo*, ¶ 27, 388 P.3d at 875-76 (concluding that an interviewer's statements — based on her training and experience — "describing her professional background, including the number of interviews she has conducted and the number of times she has testified in court, is not expert testimony because any ordinary person is capable of describing her own credentials"). *But cf. People v. Garner*, 2015 COA 175, ¶ 31, ___ P.3d ___, ___ (determining that a detective's statements that, based on his training and experience, he preferred in-person lineups to photographic lineups was "proper [under CRE 701], because the detective, as a lay witness, had substantial experience conducting photo lineups") (*cert. granted* Oct. 17, 2016).

¶ 16 Colorado appellate courts have not specifically addressed whether law enforcement officer testimony about conclusions drawn

from a witness's body language is admissible lay witness testimony. Therefore, we turn to case law in other jurisdictions for guidance.

¶ 17    Courts in other jurisdictions have generally found lay testimony interpreting the meaning of a witness's body language impermissible. *United States v. Williams*, 133 F.3d 1048, 1053 (7th Cir. 1998); *State v. Reimer*, 941 P.2d 912, 913-14 (Ariz. Ct. App. 1997); *Edwards v. State*, 248 So. 3d 166, 170 (Fla. Dist. Ct. App. 2018) (citing cases); *People v. O'Donnell*, 28 N.E.3d 1026, 1033 (Ill. App. Ct. 2015); *People v. Henderson*, 915 N.E.2d 473, 478 (Ill. App. Ct. 2009).

¶ 18    In *O'Donnell*, the Illinois Appellate Court concluded that a police officer's testimony interpreting the meaning of the defendant's body language during interrogation was inadmissible. "[The police officer] specifically testified, 'When I would ask [defendant] about certain things . . . he would always look away from me, or look down * * *.  * * * [I]t's a sign of deception when someone won't look at you, when they look away to answer you.'" 28 N.E.3d at 1033.

¶ 19    Likewise, in *Edwards*, 248 So. 3d at 170, the Florida District Court of Appeal held that testimony that body language and

mannerisms indicated deception was improper. In *Edwards*, the court concluded that the trial court had improperly admitted lay witness testimony when a detective testified — based on his training and experience — that a witness's looking down, avoiding eye contact, and burying his face in his hands during interrogation indicated that the witness was being deceptive. *Id.* at 171. The defendant exhibited the same body language in his recorded interrogation shown to the jury directly after the detective's testimony. *Id.* The court ruled the testimony improper because, "[w]hile the detective did not express an ultimate opinion as to whether appellant was being truthful during the interrogation, the detective's testimony was clearly calculated to imply that appellant's body language showed he was being deceptive." *Id.* at 170-71. The court based its opinion, in part, on an earlier opinion in which the court deemed an officer's lay testimony improper because he applied his expertise in evaluating the defendant's credibility. *See Miller v. State*, 782 So. 2d 426, 431 (Fla. Dist. Ct. App. 2001).

## B. Analysis

### 1. Case Law Regarding Body Language Testimony

¶ 20    As we read the decisions cited above, the courts in other jurisdictions have concluded that testimony interpreting body language is inadmissible lay testimony.

¶ 21    Here, Deputy Johnson relied on his training and experience to interpret K.H.'s body language to indicate that he was being deceptive. His testimony exceeded the bounds of CRE 701 because it provided more than an opinion or inference rationally based on his perception; instead, it interpreted K.H.'s body language based on his training and experience.[2] This was improper under *Venalonzo*, ¶ 22, 388 P.3d at 875.

¶ 22    The present case is unlike *People v. Acosta,* where a majority of a division of our court concluded that witness testimony describing the defendant as "very guilty-looking" after the commission of a crime was proper under CRE 701 because the witness was the defendant's friend and had no training or

---

[2] We do not decide whether this would have been admissible as expert testimony.

11

experience in criminal investigations.[3]  2014 COA 82, ¶ 49, 338

P.3d 472, 481.  The *Acosta* division reasoned that "[the witness's]

statement was her summary characterization of how she perceived

defendant looked and acted immediately following the incident and

did not consist of a statement that she personally believed the crime

had occurred or that she thought defendant was guilty."  *Id.* at

¶ 46, 338 P.3d at 481.  The present case is distinguishable.  The lay

witness in *Acosta*, a friend of the defendant, possessed a baseline

familiarity with the defendant's facial features.  Deputy Johnson,

unlike the lay witness in *Acosta*, was not a friend who was familiar

with K.H.'s body language or expressions.  Thus, he was applying

his training and experience to interpret K.H.'s body language.

¶ 23     The prosecutor asked Deputy Johnson to opine on the

meaning of K.H.'s body language.  Deputy Johnson responded that,

when initially asked where he got the methamphetamine, K.H.

"didn't seem like he wanted to answer."  Deputy Johnson followed

up by asking whether he got it from Murphy, and K.H.

---

[3] We do not address whether we agree with the majority in *People v. Acosta*, 2014 COA 82, 338 P.3d 472, because the facts in the present case are distinguishable.

12

didn't snap his head and shake his head and say no right away. . . . Instead, his body language changed. He looked — had been looking at me as I was speaking to him. He looked down and away.

I took that, based on my training and experience, to be that he just really didn't want to answer me, because — and that was an affirmative.

¶ 24 During his closing argument, the prosecutor relied on K.H.'s silence to state that K.H. affirmatively "answered [Deputy Johnson's question] with his body language." Thus, Deputy Johnson's interpretation of this body language, based on his training and experience, "assist[ed] the trier of fact to understand the evidence or to determine a fact in issue," which constitutes improper lay witness opinion testimony. CRE 702; *see* CRE 701 (stating lay witness testimony may "not [be] based on scientific, technical, or other specialized knowledge within the scope of Rule 702").

¶ 25 Accordingly, we agree with other jurisdictions addressing the issue and conclude that Deputy Johnson's lay testimony improperly interpreted K.H.'s body language and exceeded the scope of permissible lay testimony under CRE 701. *See, e.g.*, *Williams*, 133 F.3d at 1053; *O'Donnell*, 28 N.E.3d at 1033. However, we note the

13

distinction between the circumstances underlying Deputy Johnson's testimony and those in situations where a witness's expressive conduct conveys a commonly understood proposition, such as a nod to denote an affirmative answer or shaking of the head to denote a negative answer.[4] Thus, we emphasize the fact-specific analysis inherent in determining whether a witness is testifying as an expert under the guise of lay witness testimony.

## 2. Harmlessness of Error

¶ 26 We conclude the admission of this testimony did not constitute harmless error. K.H.'s credibility was a significant issue at trial. Through his testimony, the court permitted Deputy

---

[4] Testimony regarding body language offers little relevance without

> a commonly accepted definition of the matrix of human expressions, body language, and actions that demonstrate [the emotion purportedly conveyed]. This definition, or understanding, may be supplied by the law, by common experience, or perhaps by social science. Without such a common understanding, the opinion by the witness that defendant [was portraying a certain emotion] has no probative value whatsoever.

*Id.* at ¶ 104, 338 P.3d at 489 (Berger, J., concurring in part and dissenting in part).

Johnson to tell the jury that through K.H.'s body language, K.H. had told the deputy who had given him the methamphetamine — Murphy. That is, the court essentially allowed Deputy Johnson to tell the jury that, even though K.H. was telling a different story at trial, his training and experience enabled him to determine which version was correct because he was able to see and interpret K.H.'s body language during the initial interview. Thus, if the jurors were in a situation where they could not determine which version of K.H.'s story to believe, they could have turned to the deputy's improper statements that the victim's body language said it all: Murphy sold him the drugs.

¶ 27    We recognize that some properly admitted evidence suggested that Murphy used methamphetamine, including K.H.'s description of the circumstances under which he consumed methamphetamine, the fact that he was with Murphy, and that he knew she used methamphetamine. However, other evidence suggested that Murphy did not give K.H. the drugs. When later interviewed by other law enforcement officers and investigators, K.H. repeatedly stated that he bought it from someone else. In fact, the only statement that suggested that Murphy supplied him the

15

methamphetamine was given to Deputy Johnson, during the interview that is central to this case, when K.H. was hospitalized and still under the influence of the drugs. Another investigator testified that the brand of syringes found in Murphy's home was different from that found in K.H.'s backpack.

¶ 28     Further, the jury may have unduly weighed Deputy Johnson's interpretation of K.H.'s body language because it — coupled with K.H.'s response that she sold him the methamphetamine — was the only evidence that connected Murphy directly to K.H.'s possession of the drugs. Without his testimony interpreting the body language, it is reasonably probable that the outcome would have been different, and thus the improper testimony substantially influenced the verdict. *See Krutsinger v. People*, 219 P.3d 1054, 1063 (Colo. 2009).

¶ 29     Therefore, we conclude that the error in admitting the prejudicial testimony affected Murphy's substantial rights and constituted reversible error. *See Kubuugu*, ¶ 16, ___ P.3d at ___ (concluding that police officer's inadmissible testimony regarding metabolized alcohol odors influenced the verdict; the error was not

16

harmless even though some evidence supported prosecution's case and other evidence supported defendant's case).

## IV. Improper Testimony on Credibility of Witness

¶ 30 Murphy contends that Deputy Johnson improperly opined as to the veracity of K.H.'s testimony by stating, "[K.H.] told me he didn't remember [who had given him the methamphetamine]. Well, I believed that he did remember, he just didn't want to tell me . . . ." Since we reverse the trial court's judgement based on improper admission of lay witness testimony under CRE 701, we need not address this issue because we cannot say whether or in what context it is likely to arise on remand.

## V. Conclusion

¶ 31 Accordingly, the judgment is reversed, and the case is remanded for a new trial.

JUDGE TOW concurs.

JUDGE BERGER specially concurs.

JUDGE BERGER, specially concurring.

¶ 32    I agree with the majority that "Deputy Johnson's lay testimony
. . . exceeded the scope of permissible lay testimony under CRE
701." *Supra* ¶ 25.  The deputy testified that his interpretation of
K.H.'s body language was based on his "training and experience."
That training and experience went "beyond the realm of common
experience and require[d] experience, skills, or knowledge that the
ordinary person would not have" and therefore constituted
specialized knowledge that was inadmissible as lay testimony.
*Venalonzo v. People*, 2017 CO 9, ¶ 22.

¶ 33    The majority could have, and should have, stopped there.  But
the majority then waded into the enormously complicated subject of
the admissibility of an observer's opinion regarding the meaning of
another person's body language.

¶ 34    This was unnecessary to the CRE 701 analysis.  It was also
unnecessary because the challenged testimony by the police officer
was, in this context, an improper commentary on the credibility of a
material witness in this case.

¶ 35    The officer who interviewed K.H testified that when he initially
asked K.H. if he obtained methamphetamine from his sister, he was

18

not forthcoming.  The officer further testified that, based on his training and experience, he construed K.H.'s body language as conveying that the answer to the question was affirmative, even though K.H. did not expressly then communicate an affirmative answer.  If this were the end of the colloquy, or the officer's testimony at trial, it would be unfair to characterize the officer's testimony as a commentary on K.H.'s credibility.  However, immediately after the officer observed K.H.'s body language, he directly asked K.H. whether Murphy gave or sold the methamphetamine to him.  K.H. responded: "She sells it to me." Because K.H. admitted to the officer that Murphy sold him the drug (immediately after "not being forthcoming"), the relevance of the officer's opinion regarding K.H.'s body language is questionable.  As the majority reasons in its analysis of whether the improper admission of the body language evidence required reversal, the real effect (and I submit the only real probative value) of the officer's body language opinion goes to K.H.'s credibility.  This is so because later in the case, K.H. testified that he did not get the methamphetamine from his sister (and denied telling the officer the contrary).

19

¶ 36    Under longstanding Colorado Supreme Court precedent, it is improper and inadmissible for any witness, lay or expert, to express an opinion as to whether another witness has told the truth or lied on a particular occasion. *Liggett v. People*, 135 P.3d 725, 731 (Colo. 2006). Application of this settled principle of law compels the conclusion that the admission of that evidence constituted error without regard to any analysis of body language.

¶ 37    The majority's body language analysis is problematic for several reasons.

¶ 38    First, the law does not support the majority's analysis to the extent it claims. Because of the paucity of published opinions in Colorado on this subject (with one glaring exception), the majority purports to rely on a number of out-of-state cases to reach the conclusion that the admission of interpretative body language evidence was error in this case. The problem, though, is that with one possible exception (*United States v. Williams*, 133 F.3d 1048 (7th Cir. 1988)), the cases relied on by the majority are cases that were decided by application of the familiar principle that one witness cannot express an opinion of the credibility of another witness.

¶ 39   Then, after relying on these out-of-state cases (most of which add little or nothing to the inquiry), the majority chooses to duck any analysis of the one Colorado case that directly addresses the admissibility of opinions regarding the body language of another — *People v. Acosta*, 2014 COA 82.  Though I believe *Acosta* was wrongly decided, any meaningful consideration of the admissibility of testimony interpreting body language should squarely address *Acosta*.

¶ 40   In *Acosta*, a witness testified that the defendant was "very guilty-looking" when she saw the defendant immediately after the alleged sexual assault.  *Id.* at ¶ 1.  The majority differentiates *Acosta* on the ground that, unlike the deputy here, the witness in *Acosta* was a friend with a "baseline familiarity with the defendant's facial features."  *Supra* ¶ 22.  But while the *Acosta* majority stated that the defendant and the witness worked together and that the defendant had described the witness as a friend, it never discussed the witness's baseline familiarity with the defendant's facial features — only that the witness saw the defendant after the alleged incident and that she had a rational basis for her opinion.

¶ 41    By drawing this distinction between the witness's testimony in *Acosta* and the deputy's testimony here, is the majority stating that body language interpretation is permissible if the witness is familiar with the person described, but impermissible if they've only just met? How familiar do they need to be? Neither *Acosta* nor other Colorado cases answer these questions.

¶ 42    Second, to the extent the majority concludes that lay opinions regarding the meaning of the body language of another sometimes are admissible but sometimes are not, the majority gives the reader and, more importantly, trial judges no guidance.

¶ 43    Third, if, in the alternative, the majority is saying that an opinion on the body language of another *never* is admissible because it is not reliable or helpful to the fact finder, that conclusion is directly contradictory to the majority opinion in *Acosta.* In addition, such a rule strikes me as the type of categorical prohibition that will inevitably run up against facts and circumstances that render the broad rule unworkable. Moreover, to the extent that such a prohibition is premised on the inherent unreliability of body language interpretation, I note that courts invite, indeed require, jurors to engage in that exact process in

every case. COLJI-Crim. B:01 (2018) ("Consider each witness's knowledge, motive, state of mind, demeanor, and manner while on the stand."); COLJI-Civ. 3:16 (2018) (same).

¶ 44 In conclusion, while I agree with the majority's analysis under CRE 701, I do not agree with the majority's analysis of the admissibility of opinions regarding the body language of others. While I have serious concerns about the majority's harmlessness analysis and, in the end, think that is a very close question, I concur in the court's judgment.