NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210421-U

NO. 4-21-0421

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 25, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JUAN LORENZO, | ) | No. 19CF535 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

_____

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the evidence was sufficient to prove
defendant guilty beyond a reasonable doubt; (2) the trial court did not err by
admitting a video pursuant to section 115-10 of the Code of Criminal Procedure
of 1963 (725 ILCS 5/115-10 (West 2018)); (3) if the trial court did err by
admitting the victim's testimony regarding prior disclosures of abuse, any error
was harmless; and (4) defendant's convictions did not warrant reversal under the
plain-error doctrine.

¶ 2    In May 2019, the State charged defendant, Juan Lorenzo, with eight counts of

predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)).  In April

2021, a jury found defendant guilty of all eight counts.  In June 2021, the trial court sentenced

defendant to 10 years' imprisonment on each count to be served consecutively.

¶ 3    Defendant appeals, arguing (1) the trial court erred by denying defendant's

motion for a directed verdict and his motion for a new trial because the evidence was insufficient

to support his convictions; (2) the court erred by admitting the videotaped interview of N.D. into

evidence because the time, content, and circumstances of the interview were not sufficient to establish reliability; (3) the court erred by allowing N.D. to testify she made three previous complaints of abuse against defendant to her mother because the statements were not submitted to the court prior to trial and were prior consistent statements improperly used by the State to bolster N.D.'s credibility; and (4) defendant's convictions should be reversed under the plain-error doctrine because (a) a witness for the State gave improper opinion testimony on defendant's credibility, (b) the State made improper arguments in closing, and (c) the recorded interview had unfairly prejudicial comments on immigration status and witness credibility. For the following reasons, we affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5        In May 2019, the State charged defendant with eight counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2018)).

¶ 6                               A. Pretrial Proceedings

¶ 7        In December 2019, the State filed a notice of intent to use prior statements of N.D., the minor victim, pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2018)). The State specified it intended to use prior statements N.D. made to (1) her father, Felipe Garcia, on February 25, 2019; (2) a doctor, Joel Nilles, on February 25, 2019; and (3) a Children's Advocacy Center (CAC) trained forensic interviewer, Mary Whitaker, on March 8, 2019. In January 2020, the trial court held a hearing on the State's section 115-10 motion.

¶ 8        Garcia testified one of his two children, N.D., was 11 years old. According to Garcia, N.D. lived with her mother, Dalila D. Garcia testified that, at some point, Dalila lived with defendant. In February 2019, N.D. became upset and cried on a Sunday night when Garcia

- 2 -

had to take her back to Dalila's house.  Later that day, Garcia spoke with N.D. on the phone and N.D. was "scared or panicked."  The next day, N.D. told Garcia defendant had abused her.  Garcia testified, "I asked her did he put his penis under, in the bottom, and she said yes, and I asked her did you bleed.  No.  He said something else came out.  Something white came out like pus."  According to Garcia, N.D. brought new toys with her to three visits in a row and told him defendant bought her the toys.

¶ 9    Garcia testified the first time N.D. indicated she had been sexually abused was on February 25, 2019, and she had lived with Garcia since that time.  Garcia clarified he meant vagina when he asked N.D. if defendant put his penis in N.D.'s "bottom."  During the February 25, 2019, phone call, N.D. did not disclose that defendant had put his penis in her anus or her mouth.  N.D. told Garcia she told her mother about the abuse a year after it happened, and her mother told her not to tell Garcia.  Following the phone call, Garcia took N.D. to the Western Avenue Community Center and contacted the Bloomington police.  An officer accompanied Garcia and N.D. to the hospital for a physical examination.

¶ 10    Joel Nilles, an emergency room physician, testified that he saw N.D. on February 25, 2019.  Nilles did not perform a sex assault kit evaluation because the timeframe between the alleged assault and the day Nilles saw N.D. was quite long.  Nilles conducted a general wellness exam and had a conversation with N.D. where she disclosed that her mother's spouse had sexually assaulted her.  Specifically, N.D. indicated the man put his penis in her mouth and vagina.  According to Nilles, N.D. was very anxious and upset and "she acted like she had done something wrong."  Nilles acknowledged he was not told details as to the time or place the abuse occurred or how many times it occurred.

¶ 11        Mary Whitaker testified she previously worked as a forensic interviewer for CAC for approximately 21 years.  According to Whitaker, she audio and video recorded her March 8, 2019, interview with N.D.  Whitaker detailed her training and interview techniques and explained that she used "[o]pen-ended, non-leading questions in order to get some narrative from the child."  Whitaker testified N.D. had difficulty providing details "[a]t some points."  According to Whitaker, N.D. could not recall when the first incident of abuse happened.  Whitaker testified N.D. was very emotional and "[s]he was trying very hard, but she needed more.  She wanted more direct questions instead of giving a narrative."  N.D. said the abuse occurred when her mother was at work, but she did not say anything to indicate what time of the year the abuse occurred such as a birthday or weather conditions.  Whitaker agreed the abuse occurred at least three years and two months before the interview.

¶ 12        The trial court admitted a recording of the interview Whitaker conducted with N.D.  During the March 8, 2019, CAC interview, N.D. identified herself and stated she was 10 years old.  N.D. was at CAC with her father and an interpreter because her father spoke Spanish.  N.D. lived with her mother, Dalila D., her older brother, J.G., and her baby sister.  N.D. knew why she was at CAC.  N.D. stated she was at CAC because her mother's ex-husband, defendant, abused her.  According to N.D., the abuse occurred while her mother and defendant were still married.  N.D. stated something happened to her more than one time.  N.D. said she was six or seven years old the first time something happened, but she did not remember the first time and did not remember how many times something happened.  According to N.D., the abuse occurred in defendant's room when the family lived at Hilltop.

¶ 13        N.D. stated defendant would ask her to come into his room.  N.D. said defendant touched her vagina with his penis.  N.D. began to cry, and Whitaker stated, "you know this isn't

your fault, right?" N.D. said she felt like it was her fault because "he would bribe [her] with toys." Defendant told N.D. not to tell her mother. N.D. said defendant's "body part" would "go in" her "body part," and it happened more than one time. N.D. stated defendant gave her a pencil box she saw at a store, a doll, and a picnic set. N.D. was six years old when the first incident of abuse occurred and she was seven years old when the last incident occurred. According to N.D., the abuse occurred in the bedroom defendant shared with her mother. N.D. stated the abuse occurred when her mother was at work and her brother was outside.

¶ 14 Whitaker brought drawings of a male and female for N.D. to indicate body parts. N.D. indicated defendant made her use her mouth on his penis. N.D. did not know how many times it happened, but it was more than one time. According to N.D., defendant used his mouth on her vagina more than once, but he stopped because she did not like it. N.D. also stated defendant showed her a movie of a boy and a girl because "he wanted [her] to know how to do it." N.D. said she told her mother about the abuse a couple of times but her mother did not believe her. N.D.'s mother told her that if the allegations were true, N.D. "was kind of ruining his life" because he had a daughter and would "get sent back to Guatemala." N.D. said she told her father "he destroyed my life."

¶ 15 At one point, N.D. stated she did not know what defendant was doing was a bad thing and, one time, she wanted to "do it" because she wanted a toy. According to N.D., defendant would sometimes take her clothes off and sometimes he would tell her to take her clothes off. N.D. stated defendant would take her and her brother to garage sales and he was in charge when her mother was at work. N.D. indicated defendant made her put her mouth on his penis, defendant used his tongue on her vagina, and defendant put his penis inside of her vagina. N.D. also pointed to the penis on the drawing and stated "this was sometimes there" as she

pointed to the buttocks of the female drawing. At the end of the interview, Whitaker told N.D. she thought N.D. really had been honest and if she realized she forgot something she was not being dishonest and should just tell someone that she had something else to say.

¶ 16    In August 2020, the trial court entered a written order granting the State's motion to use N.D.'s statements to her father on February 25, 2019, and Whitaker on March 8, 2019, and denying the motion to use N.D.'s statement to Nilles on February 25, 2019. With respect to the statements made to Garcia, the court concluded as follows:

> "Mr. Garcia's testimony shows that N[.]D[.] was the one who initiated the conversation over the alleged abuse. N[.]D[.] provided details to Mr. Garcia as to what allegedly happened. The information provided to Mr. Garcia does not show adult prompting or questions which suggest an affirmative answer. The [c]ourt finds sufficient reliability to admit the statements if the foundational elements pursuant to 725 ILCS 5/115-10(b) are met. The delay in the reporting goes to weight as opposed to admissibility."

With respect to the statements made to Whitaker, the court noted her experience and qualifications as a forensic interviewer. The court further noted the interview took place in a controlled setting and only Whitaker and N.D. were present. The court concluded as follows:

> "The interview techniques were not suggestive of answers. N[.]D[.] did not use terms to suggest that she had been coached on what to say and the terminology used by N[.]D[.] was that which would be expected from a child. N[.]D[.] did have difficulty

talking about the incident which is understandable considering the

age, education level[,] and emotional toll talking about such a topic

would take on an alleged victim. The [c]ourt finds the interview

questions were reasonable questions that did not suggest

affirmation or planned answers. The [c]ourt finds no adult

prompting or manipulation in the interview. The interview did

take place nearly 3½ years after the alleged incident which the

[c]ourt finds goes to weight as opposed to admissibility.

[Citation.] The [c]ourt finds sufficient safeguards for the

admission of the [CAC] interview."

¶ 17 In March 2021, the trial court held a hearing on motions *in limine* filed by the State and defendant. After ruling on the motions *in limine*, the court asked if the State had anything else to raise. The State indicated that it anticipated asking N.D. why she waited to disclose the abuse. According to the State, N.D. was going to testify that she disclosed to her mother three times and the State intended to elicit testimony as to what her mother's response was and why it delayed the next disclosure. The State noted defense counsel believed the statements should have been raised in a motion pursuant to section 115-10. However, the State argued N.D. was going to be testifying and "she is not going to testify regarding the statements that Mom made to her for the purposes of providing that to the jury for the truth of the matter asserted, but simply why she waited to make the next disclosure and why it took so long for this to come out."

¶ 18 Defense counsel argued that N.D.'s statement that she previously told her mother about the abuse was "a prior consistent statement within a [c]ourt preliminarily approved hearsay

statement. But that statement itself is not admissible. A 115-10 statement must narrate the events and describe the details of the events." Defense counsel also argued there was insufficient foundation as to the dates the disclosures were made to N.D.'s mother. The trial court asked whether N.D.'s testimony that she tried to disclose to her mother would be relevant if the defense was going to bring up the fact that disclosure was delayed by approximately three years. Defense counsel stated his objection was "hearsay, not so much relevance." Counsel again asserted a more precise foundation was required if the State wanted to bring out the fact there were earlier disclosures. Counsel again argued the testimony was inadmissible hearsay not within an exception under section 115-10 or the prompt complaint rule. The court stated it would not outright bar the testimony prior to trial, but it would allow N.D. to testify and would rule on specific objections during the course of trial.

¶ 19                                    B. Jury Trial

¶ 20             In April 2021, the matter proceeded to trial where the jury heard the following evidence.

¶ 21                                    1. *N.D.*

¶ 22             N.D. testified she was 12 years old and in sixth grade at Bloomington Junior High School. N.D. lived with her father and grandmother, and her older brother, J.G. Her two little sisters lived with her mother. N.D. began living with her father two years earlier and, prior to that, she lived with her mother. According to N.D., her mother was married to defendant for approximately three years and, when N.D. was six years old, N.D., J.G., her mother, and defendant lived in a trailer at Hilltop. N.D. stated she shared a bedroom with J.G. and her mother and defendant shared the other bedroom. N.D. testified she was in kindergarten and she and her brother rode the bus to and from school. According to N.D., her uncle, her aunt, and

defendant would watch the children when they got home from school and her mother was working.

¶ 23 The State asked N.D. if anything happened with defendant that N.D. did not like and N.D. responded affirmatively. The State then asked, "This thing that would happen, would it happen one time or more than one time," and N.D. responded, "More than one time." N.D. could not recall how many times it happened. N.D. testified she was six years old when the incidents began, and she was eight years old the last time something happened. According to N.D., the incidents occurred in her mother's bedroom when N.D. was watching television or when defendant told her to go to the bedroom. N.D. testified the incidents would occur when her mother was at work and her brother was outside playing with friends.

¶ 24 When asked what would happen in the bedroom with defendant, N.D. stated, "He would abuse me sexually." N.D. testified defendant would put his "front part," meaning penis, in her "front part," meaning vagina. N.D. stated defendant would also put his penis "to my back part, my butt, but I also call it a back part." N.D. also testified defendant would put his mouth to her "front part" and put N.D.'s mouth to his "front part." When these incidents occurred, N.D. either took off her clothes or defendant would take off her clothes. When defendant's "front part" touched N.D.'s "front part," they would lay side by side or one of them would be on top while the other was on their back. When defendant's "front part" touched N.D.'s "back part," they would be sideways or defendant would stand and hold N.D. up off the ground. According to N.D., when defendant's "front part" touched N.D.'s "front part" or "back part" his body went "in and out." When defendant's mouth touched N.D.'s front part, "[h]e would lick it." When N.D.'s mouth touched defendant's "front part" it went "[i]n and out." N.D. testified each of the incidents occurred more than once.

¶ 25 N.D. testified defendant showed her videos and told her what to do during the encounters. Defendant also told N.D. not to tell her mother about the incidents. According to N.D., defendant bought her toys in exchange for the acts. N.D. testified defendant took her shopping at Walgreens, Walmart, and to yard sales. N.D. believed defendant bought her gifts in exchange for the acts because she would ask for a toy and receive it either before or after the acts. N.D. recalled receiving the following from defendant: "A pencil box that you could lock and have a key. And then a doll. And then a little tea set."

¶ 26 N.D. testified she did not tell anyone about the abuse when it was happening because defendant told her not to tell anyone. The following exchange occurred:

"Q. Did you eventually tell anybody?

A. Yes.

Q. Who did you eventually tell?

A. My mom.

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

Q. Do you recall how many times you told your mom?

A. Three.

Q. Okay. And did your mom ever say anything to you about, about when you would have these conversations with her?

A. Yes.

Q. Okay. And tell us about that.

A. The first one, she told me why I didn't tell her first, like why I asked her at my aunt's house because for a time we were

living with her, and then that is all I can remember from that one.

Then the second one she told me not to tell my dad. And then the

third one I remember she told me that I would be the one going to

jail because she said I was a liar."

Defense counsel objected based on foundation and hearsay. In a sidebar, the State argued the testimony was "not offered for the truth of the matter as in whether or not [N.D.] would be in trouble or whether or not she was lying. They are offered to show why [N.D.] did not disclose." The State further asserted the testimony went toward N.D.'s "credibility and why there is a delayed disclosure." Defense counsel argued the testimony was neither a "prompt complaint" nor admissible under section 115-10, but rather was an inadmissible prior consistent statement and inadmissible hearsay. The State argued that the testimony was admissible because it was relevant to N.D.'s credibility as to why she delayed disclosing the abuse to someone other than her mother. The court overruled the objection.

¶ 27        N.D. testified J.G. was always with her when defendant watched them. N.D. acknowledged defendant worked at the Debra Thomas Daycare Center, a hotel, and a gym but maintained he still would have had time to take care of J.G. and N.D. N.D. testified she spent every weekend with her father and she went to school every day during the week. According to N.D., her mother worked during the day and was usually home at night.

¶ 28        N.D. reiterated her testimony that the abuse first occurred when she was six and the last incident occurred when she was eight. N.D. testified she was seven years old when her mother and defendant separated and she turned eight a year after she moved out of the trailer at Hilltop. Defense counsel asked if every incident occurred in the trailer and while defendant and her mother were still married and N.D. responded affirmatively. Defense counsel then asked,

"So nothing could have happened when you were eight?" N.D. explained, "Well, we used— since they were divorced they would have to take papers for the trailer and stuff like that and one time I went in the trailer. I said close to it, I didn't say that I was fully eight but close to eight. And when we went to go take some papers there he tried doing it again, which is why I said close to eight years old." N.D. testified the abuse occurred once at defendant's sister's trailer also at Hilltop. The situation was stopped because other children were present. When asked if the other children should have seen the abuse, N.D. stated, "Yes. They were in their bedroom playing. But like I said, I cannot remember if it was before they came out of the bedroom or after."

¶ 29        N.D. testified she could not remember whether she told Whitaker that defendant bought her toys from Walgreen's or Walmart. N.D. acknowledged that defendant also bought toys for J.G. N.D. would show the toys defendant bought to her mother and defendant never asked her to hide the toys. After her mother and defendant separated, N.D. lived with her mother's aunt, Inez Griffith, for several months. N.D. acknowledged she never said anything about the abuse to Griffith.

¶ 30                                  2. *Curt Maas*

¶ 31        Curt Maas, a detective with the Bloomington Police Department, testified he specialized in working cases with child victims. Maas explained the Bloomington police worked with the CAC and other agencies as a multidisciplinary team to investigate allegations involving children. As part of his investigation into this case, Maas learned defendant's birthdate was "12/8 of '78."

¶ 32        Maas testified he called defendant to arrange an interview and defendant appeared for the interview and answered Maas's questions. According to Maas, his interviews indicated

attempts to isolate defendant and N.D. Maas testified, "I asked [defendant] if he ever had alone time with [N.D.], he said he did. I asked—at first he minimized. I asked him how much he watched [N.D.] He disclosed at the beginning he tried to minimize and say it was only a little bit here and there. And then towards the end of the interview he tells me about on the weekend how he'd watch the kids from 8 a.m. till 1 p.m. So he later explained that there was a lot bigger amount of time that he watched the kids and [N.D.]" Maas did not talk to any witnesses that suggested defendant asked to separate N.D. from J.G. Maas admitted it would be unusual for these crimes to occur with someone else present and most people would try to get the child alone with enough time to complete the crime.

¶ 33        When Maas interviewed defendant, he had already watched N.D.'s interview and had interviewed J.G. and Dalila. Maas acknowledged defendant was not arrested until 63 days after his interview. Maas testified he submitted his report to the State's Attorney without having reviewed N.D.'s evaluation with the Pediatric Resource Center. Maas did not consider the evaluation to be critical evidence because the abuse occurred years prior and "it would be absolutely normal for a child to not have any visible injuries." When asked why he did not look for the specific times defendant worked, Maas testified he did not find it necessary because he was told by defendant, J.G., and Dalila "that [defendant] had alone time with [N.D.] At first they minimized it. Then they told me there was more alone time that he had with her."

¶ 34                                    3. *Mary Whitaker*

¶ 35        Whitaker testified about her qualifications and experience as a child forensic interviewer. The State sought to introduce the videotaped interview with N.D. into evidence. Defense counsel renewed the objections raised at the section 115-10 hearing and argued that N.D. had spoken with multiple people about the abuse prior to the CAC interview. The trial

court overruled the objection and allowed the video to be played for the jury. Defense counsel requested admonishments regarding the video, statements Whitaker made about who was at fault and that she believed N.D., and a statement made about defendant's citizenship status. Accordingly, the court instructed the jury as follows:

"First would provide, you have before you evidence that [N.D.] made statements concerning the offense charged in this case. It is for you to determine whether the statements were made and, if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of [N.D.], the nature of the statements[,] and the circumstances under which the statements were made.

Statements were also made as to a person's immigration status—or I'm sorry. Statements were also made as to a person's citizenship status, and a citizen's status is irrelevant and should not be considered by you in any way in arriving at your verdict.

Ladies and gentlemen, you've also just reviewed a video where statements were made by one party as to the truthfulness or believability of another party. The believability of a party is an issue for you to determine. And any other person's comment about a witness' believability should not be considered by you in any other way in arriving at your verdict."

¶ 36　　　　Whitaker identified People's exhibit Nos. 2 and 3 as the diagrams used during N.D.'s interview. According to Whitaker, at the very end of the interview N.D. "pointed to the

- 14 -

girl's bottom and the boy's penis." Defense counsel asked if Whitaker's statements that the abuse was not N.D.'s fault were made to comfort N.D. and Whitaker responded affirmatively. Whitaker testified she had not investigated the truth of the allegations.

¶ 37                    4. *Dr. Channing Petrak*

¶ 38          Dr. Channing Petrak, the medical director of the Pediatric Resource Center, was tendered as an expert witness in child abuse pediatrics and examination. In March 2019, Petrak examined N.D., obtained a thorough medical history, and performed an anogenital exam. Petrak's exam showed N.D.'s genitals and anus were normal for a prepubescent child. According to Petrak, the edges of N.D.'s hymen were "uninterrupted and there was no sign of any penetrative trauma to the hymen." Petrak testified there was no urgency to schedule N.D.'s exam because the abuse occurred years before and genital tissue heals rapidly. Petrak testified it was normal to have a normal exam even where abuse had occurred. According to Petrak, it was normal not to see penetrative trauma to the hymen because genital tissue is flexible and heals quickly even if the abuse was repeated.

¶ 39                    5. *Debra Thomas*

¶ 40          Debra Thomas testified she owned a daycare center that N.D. and J.G. attended in 2015. In 2015, Thomas employed approximately 21 staff members who were "mandatory reporters" of suspected child abuse. According to Thomas, N.D. and J.G. attended 80% of each month all year. The children could attend the daycare before and after school and the daycare provided bus service. During the summer, the children attended the daycare all day. Thomas did not observe any unusual behavior by N.D. that led her to suspect sexual abuse. Thomas testified N.D. never disclosed that she was being sexually abused to her or her staff. Defendant was employed at the daycare as a cook for seven years and worked there in 2015. Defendant was

never alone with children at the daycare and Thomas never observed defendant alone with N.D. Thomas never asked N.D. if she experienced sexual abuse and did not recall any specific one-on-one conversations with N.D.

¶ 41                                6. *Inez Griffith*

¶ 42          Inez Griffith testified she was N.D.'s maternal great aunt. When Dalila was married to defendant, Griffith testified she saw the family two or three times a week. Griffith testified she never observed unusual actions between defendant and N.D. and she never observed defendant acting inappropriately toward N.D. When Dalila and defendant separated, Dalila, J.G., and N.D. lived with Griffith for two months. Griffith testified N.D. never disclosed she had been sexually abused.

¶ 43                                7. *Miriam Lorenzo Augustine*

¶ 44          Miriam Lorenzo Augustine testified she was defendant's sister and lived in the Hilltop mobile home park. Augustine testified she had three children and she knew N.D. According to Augustine, at no time in 2015 did she ask defendant to babysit her children or be in her home when she was not there. Augustine testified defendant had no other sisters who lived at Hilltop. Augustine testified she did not spend much time with defendant and acknowledged she would not know what defendant was doing because she "was always working."

¶ 45                                8. *J.G.*

¶ 46          J.G. testified he was N.D.'s older brother and he was 14 years old at the time of trial. During the time defendant and J.G.'s mother were married, J.G. lived with his mother, defendant, and N.D. in defendant's trailer at Hilltop. J.G. testified he and N.D. lived primarily with their mother and saw their father on weekends. J.G. and N.D. attended the Debra Thomas daycare while his mother worked at Destihl restaurant and defendant worked at Dairy Queen, a

daycare, and a third job J.G. could not recall. J.G. testified defendant sometimes took care of him and N.D. J.G. did not recall any time that defendant took care of N.D. alone. According to J.G., he and N.D. spoke daily and she never said defendant had been inappropriate with her. J.G. never observed defendant and N.D. alone in a bedroom together.

¶ 47   J.G. testified his mother talked to him and N.D. about "good touches and bad touches." According to J.G., N.D. never said anything about being sexually abused until the day she told their father. J.G. testified defendant would babysit when their parents or others were not available. J.G. testified, "We weren't allowed to go outside since we needed my mom to do that." When asked to clarify, J.G. stated, "Because my mom stated the rule, you guys aren't allowed to go outside until I'm here. Or until I'm home." Defendant followed that rule. J.G. acknowledged there were instances where he went outside, "but it was never over five minutes." J.G. testified defendant would take the children to garage sales and buy them both toys.

¶ 48   J.G. testified the bedroom his mother and defendant shared did not have a lock on the door but there was a little keyhole and no one knew where the key was. During his interview with Detective Maas, J.G. said there were times he would be outside. J.G. testified he meant there were times he would be outside after his mother got home. After he learned of the allegations, J.G. never spoke about the allegations with N.D. J.G. testified his friend next door had dogs that he would go play with sometimes.

¶ 49                    9. *Defendant*

¶ 50   Defendant testified he was born January 28, 1978, and he had a three-year-old daughter. Defendant denied sexually abusing N.D., touching N.D.'s private parts, having N.D. touch his private parts, taking off his or N.D.'s clothes, or watching pornography with N.D. Defendant further denied touching N.D. in any way for the purpose of his own pleasure or

buying N.D. toys to get her to engage in sexual activities. Defendant denied doing anything inappropriate with N.D.

¶ 51        Defendant identified a number of photographs of the trailer the family lived in at Hilltop. According to defendant, a person could get from the front door of the trailer to his bedroom in approximately 30 seconds. Defendant testified you could easily see into the bedroom windows and you could hear sounds through the trailer's walls because they were poorly insulated. In 2015, defendant worked at the Debra Thomas Daycare from 6 a.m. to 3 p.m. Monday through Friday. Defendant also worked part-time at Dairy Queen in the evenings. According to defendant he also worked at Gold's Gym from 5 p.m. until 10 or 11 p.m. Defendant also worked at the DoubleTree on weekends from 5 a.m. to 1:30 p.m.

¶ 52        Defendant testified he considered J.G. and N.D. to be his children and he never had any problems with them. According to defendant, N.D. "was always either at daycare or at school." Dalila had a rule that the children had to be supervised if they played outside, and defendant would not let the children play outside without supervision. Defendant testified he always watched the children together. Defendant would take the children out for food and to garage sales where he occasionally bought them toys.

¶ 53        Defendant testified he received a phone call from Maas and set up an appointment to meet. Defendant went to the meeting without an attorney "because [he] didn't have anything to hide or conceal." Defendant told Maas he spent approximately 10% of his own time watching the children. Defendant testified he did not have enough time or opportunity to do the things N.D. testified about because he was always working. Defendant acknowledged he told Maas there were times that J.G. would go outside and N.D. stayed inside with defendant. Defendant denied trying to minimize how much time he spent with the children and he guessed he spent

10% of his time with them because he had three jobs and could not be everywhere. Defendant admitted there were times he watched the children by himself for up to four or five hours.

¶ 54                                  10. *Stipulation*

¶ 55        The parties stipulated that defendant's supervisor at the DoubleTree hotel would testify that defendant began part-time employment at the hotel on or about February 28, 2015, and worked Saturdays and Sundays from 5 a.m. to 1:30 p.m. through the end of 2015. Defendant's payroll records from the DoubleTree hotel were introduced as an exhibit.

¶ 56                                  11. *Dr. Kaye Harms Toohill*

¶ 57        Dr. Kaye Harms Toohill testified she was a pediatrician and had been N.D.'s primary care physician since her birth. Toohill testified she saw N.D. three times during 2015. One visit was for a routine well-child exam and the other two visits were for a sore throat and eczema. According to Toohill, nothing in the course of treating N.D. caused Toohill to make a report of suspected abuse. Toohill testified she had knowledge to spot symptoms that would raise a suspicion of sexual abuse and she did not see anything that would lead to inquiring further about that issue with N.D. Toohill testified she did not perform sexual assault examinations as part of her pediatric practice. Toohill acknowledged she did not have any red flags because N.D. did not disclose the abuse to her. According to Toohill, if the abuse had been disclosed to her, she would have referred N.D. to the Pediatric Resource Center.

¶ 58                                  12. *Closing Argument*

¶ 59        During closing argument, the State argued N.D. had testified to the best of her ability about the allegations of abuse. The State summarized N.D.'s testimony and reviewed the propositions it was required to prove to sustain a conviction. The State noted N.D. testified that defendant's penis touched her vagina, her anus, and her mouth and defendant's mouth touched

her vagina. N.D. described the positions she and defendant were in when the abuse occurred and described defendant's penis as going "in and out." The State further argued defendant had the opportunity to commit the offenses. According to the State, Petrak testified N.D.'s exam was normal, and it was normal for the exam to be normal. The State further argued that Petrak testified that a delayed disclosure was normal and only one in four children disclose abuse right away. The State explained that N.D.'s disclosure was delayed because she told her mother about the abuse on three occasions and her mother told her not to talk about it.

¶ 60 The record includes a power point presentation with clips from the CAC interview that the State played during closing and rebuttal argument, but the record is not clear as to which clips were played when. The power point presentation included a clip from the CAC interview where N.D. stated that "he destroyed my life." Another slide contained a clip where N.D. stated the abuse occurred while her mother was at work and her brother was outside playing with friends. Another clip showed N.D. stating defendant gave her a pencil box she saw at a store, a doll, and a picnic set. In a slide labeled "There was no outward signs of trauma to observe," the State included a clip of N.D. stating one time she wanted to "do it" because she wanted a toy. The final slide again included the clips of N.D. stating defendant destroyed her life and describing the toys defendant bought her. It also included a clip of N.D. stating she was seven years old when the last incident of abuse occurred. Finally, the State included a clip of N.D. recounting that her mother did not believe the abuse occurred and believed defendant was a good person.

¶ 61 The prosecutor stated, "Ladies and gentlemen, I think through this trial there's been sufficient evidence for you to find the defendant guilty on all eight counts. There has been sufficient evidence to explain to you about what happened to [N.D.] when she was six, seven

years old." The prosecutor concluded by arguing that if the jury believed N.D. "the verdict should be guilty on all eight counts."

¶ 62            Defense counsel argued the State failed to prove defendant guilty. Defense counsel pointed out Maas's testimony that it was unlikely for a perpetrator to commit an act of abuse under circumstances where somebody would likely walk into the room. Counsel argued that the exam Petrak performed was normal because N.D. had "never been sexually abused to begin with." Counsel further pointed out it called witnesses who were mandatory reporters of abuse who saw nothing that caused them to report. Defense counsel further argued J.G.'s testimony showed defendant never had the opportunity to commit the offenses. Counsel also argued N.D. failed to disclose the abuse to her aunt when defendant and her mother separated. Defense counsel pointed out N.D. told Whitaker the abuse only occurred in their trailer at Hilltop but testified differently at trial. N.D. also told Whitaker defendant gave her toys from garage sales, but at trial testified the toys came from Walgreens and Walmart. Counsel argued the changing story could not support a conviction on proof beyond a reasonable doubt. Defense counsel also argued Maas did not arrest defendant for 63 days and during that time "not a single piece of evidence came across his [(Maas)] desk including Dr. Petrak's report." Counsel noted, "The State has the burden of proof beyond a reasonable doubt in all cases of this nature." Counsel concluded by arguing the State failed to meet its burden of proof because defendant did not commit the offenses.

¶ 63            In rebuttal, the State argued Petrak told the jury the exam "didn't mean anything because it was expected to be normal." The State argued Maas's delay in arresting defendant was because he followed a process and was not proof that the offenses did not occur. According

to the State, defense counsel's argument about the delay in arresting defendant was "a bunch of smoke and mirrors to try to distract you from what did happen in this case."

¶ 64        The prosecutor stated, "Other smoke and mirrors is witnesses that the defense brought before you." The State argued N.D. never had the opportunity to disclose the abuse to Thomas because Thomas was not her teacher and Thomas could not recall having a one-on-one conversation with N.D. The State argued that the defense witnesses who testified that N.D. did not disclose the abuse to them did not contradict N.D.'s testimony that she never told anyone about the abuse until she told her mother. The State noted the witnesses said there were no outward signs of trauma to observe and argued this was because N.D. "didn't know what they were doing was bad." The State attacked defendant's credibility and argued he minimized how much time he spent with the children.

¶ 65        The State played a clip from the CAC interview and described the clip as follows: "You know she's talking about this time with her mom when her mom is telling her not to say anything and her mom is telling her that she could go to jail for this. And her mom tells her, the defendant is a good guy. And at ten years old she's like, [']If he's a good guy, you don't really know that, you don't know what he's thinking.[']" The State concluded, "Ladies and gentlemen, [N.D.] came before you and described to you what happened. If you believe her, you find her credible, then you must find the defendant guilty on all eight counts."

¶ 66                        C. Verdict and Sentence

¶ 67        After approximately two hours and fifty minutes of deliberation, the jury sent a note indicating they were deadlocked. The trial court responded with a note reading "Ladies [and] Gentlemen[,] [a]t this point please continue with your deliberations." The jury found defendant guilty of all eight counts of predatory criminal sexual assault of a child.

¶ 68        Defendant filed a motion for a new trial.  The motion argued the State failed to prove defendant guilty of the offenses beyond a reasonable doubt.  The motion also alleged the trial court erred by improperly admitting (1) the CAC interview, (2) "testimony by the alleged victim that she had previously made complaints about the Defendant to her mother," (3) the portion of the CAC interview "which contained an improper, irrelevant, and unfairly prejudicial reference to the Defendant's immigration status suggesting that he could be deported to Guatemala," and (4) the portion of the CAC video where Whitaker suggested the truth of the allegations and repeatedly told N.D. the alleged assaults were not her fault.

¶ 69        As to defendant's claim of insufficient evidence, the trial court noted the jury had two versions of events to consider "[a]nd they considered it, they took their time, they were paying attention during the course of the trial, and they came to the conclusion that they believed the victim in the case [N.D.]"  The court stated defense counsel competently pointed out perceived inconsistencies in N.D.'s testimony and extensively discussed the opportunity defendant had to commit the offenses.  The court concluded there was sufficient evidence for a reasonable trier of fact to convict defendant of the offenses, although it noted "it was a close case."

¶ 70        With respect to the CAC interview, the trial court noted it issued a written ruling finding sufficient safeguards of reliability and admitting the video.  The court reviewed the ruling and indicated the ruling was correct.  With respect to the statements about defendant's citizenship status and Whitaker's comments that the abuse was not N.D.'s fault, the court noted it properly instructed the jury about those comments.  As to the admission of N.D.'s disclosures to her mother, the court indicated it "agree[d] with the State on this in terms of what it was being offered for and what the question specifically was."  The State argued the admission of testimony

that N.D. disclosed the abuse to her mother and that her mother told her not to tell her father and that [N.D.] would go to jail because she was a liar was not hearsay evidence because it was not offered for the truth of the matter asserted. Rather, the State argued the testimony was offered to show why N.D. waited so long to disclose the abuse. The court further noted, "It wasn't going into any type of detail with regard to what had happened in terms of what was being asked there." The court denied defendant's motion for a new trial.

¶ 71    In June 2021, the trial court sentenced defendant to 10 years' imprisonment on each of the eight counts, to be served consecutively.

¶ 72    This appeal followed.

¶ 73                                II. ANALYSIS

¶ 74    On appeal, defendant argues (1) the trial court erred by denying defendant's motion for a directed verdict and his motion for a new trial because the evidence was insufficient to support his convictions; (2) the court erred by admitting the videotaped interview of N.D. into evidence because the time, content, and circumstances of the interview were not sufficient to establish reliability; (3) the court erred by allowing N.D. to testify she made three previous complaints of abuse against defendant to her mother because the statements were not submitted to the court prior to trial and were prior consistent statements improperly used by the State to bolster N.D.'s credibility; and (4) defendant's convictions should be reversed under the plain-error doctrine because a witness for the State gave improper opinion testimony on defendant's credibility, the State made improper arguments in closing, and the recorded interview had unfairly prejudicial comments on immigration status and witness credibility.

¶ 75                        A. Sufficiency of the Evidence

- 24 -

¶ 76     Defendant first argues the trial court erred by denying defendant's motion for a directed verdict and his motion for a new trial because the evidence was insufficient to support his convictions.  The State asserts the evidence was sufficient for any rational trier of fact to find defendant guilty.

¶ 77     When determining whether sufficient evidence supported a conviction, "our function is not to retry the defendant." *People v. Sutherland*, 223 Ill. 2d 187, 242, 860 N.E.2d 178, 217 (2006).  Instead, we must resolve " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)  *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  We allow all reasonable inferences in the light most favorable to the State.  *People v. Beauchamp*, 241 Ill. 2d 1, 8, 944 N.E.2d 319, 323 (2011).  It is the province of the finder of fact to determine the credibility of a witness and the finding is entitled to great weight.  *People v. Smith*, 185 Ill. 2d 532, 542, 708 N.E.2d 365, 370 (1999).  We reverse only where the evidence is so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to the defendant's guilt.  *People v. Evans*, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004).

¶ 78     Defendant asserts the evidence was insufficient where N.D.'s testimony was inconsistent and the evidence demonstrated he did not have the opportunity to commit the offenses.  Defendant first relies on *People v. Schott*, 145 Ill. 2d 188, 582 N.E.2d 690 (1991).  In *Schott*, the supreme court determined the victim's "testimony was so fraught with inconsistencies and contradictions that we find her testimony so lacking in credibility that a reasonable doubt of defendant's guilt remains." *Id.* at 206-07.  At trial, the victim testified the defendant put his penis halfway into her vagina, the incident occurred in the spring because no leaves were flying

around, and the incident occurred only once. *Id.* at 207. However, the victim's "juvenile court testimony was that it happened in the fall '[b]ecause all kinds of leaves were flying around,' " and "that it had happened 'almost every day.' " *Id.* The supreme court detailed further impeachment of the victim as follows:

> "Moreover, she admitted that she lied to a judge when she falsely accused her uncle Mark of doing the very act of which defendant stands accused. She stated that she 'was lying' because she was angry with her uncle. She also had a motive to falsely accuse the defendant because she wanted him to leave the house. Although she denied telling anyone that she was angry with the defendant, Nancy Carlton, a DCFS employee, testified that complainant told her that she made up the story about the defendant because '[s]he was angry at him for something.' Chicago police detective Robert Collins testified that complainant told him 'that she was mad at [the defendant] because he took one of her brothers to the carnival and didn't take her.' " *Id.*

The supreme court further detailed other ways in which the victim was impeached and noted "a reasonable doubt exist[ed] as to whether the damage to her vaginal region was caused by the defendant." *Id.* at 208. The victim admitted she had her brother put his penis inside of her and another boy had inserted his finger into her vagina. *Id.* After discussing further incidents where the victim's testimony was directly contradicted, the supreme court concluded, "[t]he complainant was impeached to such a degree that we find that the evidence presented does not establish, beyond a reasonable doubt, that the defendant is guilty." *Id.* at 209.

¶ 79     We find *Schott* distinguishable where the victim was so thoroughly impeached and her testimony was so lacking in credibility that a reasonable doubt of the defendant's guilt existed. In this case, defendant argues there were numerous inconsistencies in N.D.'s testimony. Specifically, defendant argues N.D. stated all the abuse occurred in the bedroom defendant shared with her mother in their mobile home, but at trial N.D. testified that the abuse also occurred "[o]nce at his sister's house." As the State notes, N.D.'s trial testimony was not inconsistent with her statements in the CAC video, but rather an additional detail. Moreover, defense counsel attempted to impeach N.D. on this point, asking, "And you never said anything about anything happening anywhere other than your trailer, is that right?" N.D. responded, "I think I did."

¶ 80     Defendant also argues that N.D. testified at trial that defendant bought her toys from Walgreens and Walmart, and during the CAC interview she stated defendant bought her toys from garage sales. Again, this is not an inconsistency but simply more detailed testimony. During the CAC interview N.D. stated defendant gave her a pencil box she saw at a store, a doll, and a picnic set. Although N.D. did not identify the store the toy came from during the CAC interview, we disagree that this is an inconsistency similar to those in *Schott*. Moreover, defense counsel had ample opportunity to raise these alleged inconsistencies before the jury. As discussed above, credibility determinations are the province of the jury. *Smith*, 185 Ill. 2d at 542.

¶ 81     Defendant further argues the evidence demonstrated he did not have the opportunity to commit the offenses. Specifically, defendant argues undisputed evidence established defendant did not babysit N.D. alone and he lacked the time and opportunity to commit the offenses. However, as the State points out, the mere fact that defendant watched

N.D. and J.G. at the same time does not mean that he lacked the opportunity to commit these crimes. N.D. explained that the abuse occurred when J.G. was outside playing with friends. And J.G. admitted he occasionally went outside, although he testified it was never for more than five minutes. However, J.G. may well have misjudged the amount of time he spent outside.

¶ 82   Defendant also argues that for defendant to have had the opportunity to commit the offenses he would have had to separate J.G. and N.D. or commit the offenses with J.G. close by. Defendant asserts this is highly improbable and inconsistent with common sense. Defendant points to Detective Maas's testimony that it would be unusual for the crimes to occur with someone else present. However, as the State points out, these are arguments to be made to the jury and, in this case, the jury was not persuaded on these points.

¶ 83   "The testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *People v. Gray*, 2017 IL 120958, ¶ 36, 91 N.E.3d 876. Again, we will not substitute our judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* ¶ 35.

¶ 84   Here, N.D. testified defendant would put his "front part," meaning penis, in her "front part," meaning vagina. N.D. stated defendant would also put his penis "to my back part, my butt, but I also call it a back part," his mouth to her "front part," and N.D.'s mouth to his "front part." N.D. described the positions her body and defendant's body were in when the incidents occurred. When defendant's "front part" touched N.D.'s "front part," they would lay side by side or one of them would be on top while the other was on their back. When defendant's "front part" touched N.D.'s "back part," they would be sideways or defendant would stand and hold N.D. up off the ground. According to N.D., when defendant's "front part" touched N.D.'s "front part" or "back part" his body went "in and out." When defendant's mouth

touched N.D.'s front part, "[h]e would lick it." When N.D.'s mouth touched defendant's "front part" it went "[i]n and out." N.D. testified each of the incidents occurred more than once. If believed by the jury, N.D.'s testimony was sufficient to prove defendant committed the offenses of predatory criminal sexual assault of a child.

¶ 85                                    B. Recorded Interview

¶ 86        Defendant next asserts the trial court erred by admitting the videotaped interview of N.D. into evidence because the time, content, and circumstances of the interview were not sufficient to establish reliability.

¶ 87        Generally, we will reverse the trial court's determination pursuant to section 115-10 of the Code only where the record shows the court abused its discretion. *People v. Bowen*, 183 Ill. 2d 103, 120, 699 N.E.2d 577, 586 (1998). An abuse of discretion occurs where a ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would take the same view. *People v. Sharp*, 391 Ill. App. 3d 947, 955, 909 N.E.2d 971, 978 (2009).

¶ 88        The State, as the proponent of the out-of-court statement, bears the burden of establishing the statement was reliable and not the result of adult prompting or manipulation. *People v. Simpkins*, 297 Ill. App. 3d 668, 676, 697 E.2d 302, 307 (1998). "In determining the reliability of the child's hearsay statement, relevant factors include, but are not limited to, (1) the spontaneity and consistent repetition of the statement; (2) the mental state of the child in giving the statement; (3) the use of terminology not expected in a child of comparable age; and (4) the lack of a motive to fabricate." *Bowen*, 183 Ill. 2d at 120. In conducting a section 115-10 hearing, the trial court must consider the totality of the circumstances surrounding the making of the hearsay statement. *Id.*

¶ 89   Here, the trial court noted Whitaker's experience and qualifications as a forensic interviewer. The court further noted the interview took place in a controlled setting and only Whitaker and N.D. were present. The court concluded as follows:

> "The interview techniques were not suggestive of answers. N[.]D[.] did not use terms to suggest that she had been coached on what to say and the terminology used by N[.]D[.] was that which would be expected from a child. N[.]D[.] did have difficulty talking about the incident which is understandable considering the age, education level[,] and emotional toll talking about such a topic would take on an alleged victim. The [c]ourt finds the interview questions were reasonable questions that did not suggest affirmation or planned answers. The [c]ourt finds no adult prompting or manipulation in the interview. The interview did take place nearly 3½ years after the alleged incident which the [c]ourt finds goes to weight as opposed to admissibility. [Citation.] The [c]ourt finds sufficient safeguards for the admission of the [CAC] interview."

¶ 90   Defendant asserts the delay in N.D.'s reporting of the abuse should weigh heavily against a finding of reliability. However, defendant acknowledges a delay in reporting does not automatically render the victim's statement inadmissible. Defendant asserts no cases can be found involving such a long delay in disclosure as the 3½ year delay in this case. However, defendant cites *Bowen*, 183 Ill. 2d at 120-21, where the supreme court found the evidence was properly admitted despite a nearly three-year delay. Citing the same case, the trial court

concluded the delay affected the weight to be given the evidence, not its admissibility. Defendant offers no argument that an additional six-month delay in disclosure affects the admissibility of the CAC interview.

¶ 91    Defendant further argues N.D. had no recent contact with defendant, she did not claim to have recently recalled the abuse, defendant was already divorced from N.D.'s mother, and no recent event prompted N.D. to disclose the abuse.  Defendant acknowledges that N.D. indicated in the CAC interview that a schoolmate whom she believed had been sexually abused may have been harming herself.  These facts tend to favor the reliability of N.D.'s disclosure because it demonstrates the disclosure was spontaneous and N.D. had nothing to gain and, therefore, lacked motive to fabricate the allegations.

¶ 92    Defendant further argues the statement was unreliable because N.D. was unable to provide a narrative account of the abuse, could not remember the first time the abuse occurred, and could not remember how many times the abuse happened.  However, the complained of lack of specifics were unsurprising given the circumstances.  First, N.D. was recounting repeated abuse she suffered when she was only six and seven years old.  N.D.'s mental state was evident in the CAC interview where she was visibly distraught, shaking, and crying.  N.D. also demonstrated difficulty in talking about the abuse because she was so upset.

¶ 93    Defendant asserts the interviewer asked N.D. leading questions and adult intervention occurred before the CAC interview, further undermining the reliability of the statement.  However, our review of the video indicates that Whitaker did not ask N.D. leading questions, but rather asked questions presenting a wide array of available answers and not suggesting any particular response.  As the trial court specifically found, "The interview techniques were not suggestive of answers.  *** The [c]ourt finds the interview questions were

reasonable questions that did not suggest affirmation or planned answers." As to the adult intervention that N.D. observed and took part in prior to the CAC interview, the court found "N[.]D[.] did not use terms to suggest that she had been coached on what to say and the terminology used by N[.]D[.] was that which would be expected from a child. *** The [c]ourt finds no adult prompting or manipulation in the interview." Although N.D. had some conversations about the abuse prior to the CAC interview, nothing in her statements suggested that these conversations involved adults telling her what to say.

¶ 94    Given the circumstances of this case, we cannot say the trial court abused its discretion in admitting the CAC interview pursuant to section 115-10.

¶ 95                    C. Prior Consistent Statements

¶ 96    Next, defendant asserts the trial court erred by allowing N.D. to testify she made three previous complaints of abuse against defendant to her mother because the statements were not submitted to the court during the section 115-10 hearing and were prior consistent statements improperly used by the State to bolster N.D.'s credibility. The State asserts defendant has forfeited any argument that N.D.'s testimony describing her mother's response to her disclosure was inadmissible hearsay because he failed to raise the argument before the trial court. The State further asserts that N.D.'s testimony that she made a disclosure was not an out-of-court statement, but simply testimony establishing she had made an out-of-court statement. Accordingly, the State asserts N.D.'s testimony that she made disclosures to her mother was not subject to section 115-10.

¶ 97    Even assuming, *arguendo*, N.D.'s testimony that she disclosed the abuse to her mother three times should have been addressed at the section 115-10 hearing, we conclude the alleged error constitutes nothing more than harmless error. *Sharp*, 391 Ill. App. 3d at 961.

Harmless-error review tests "whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *In re Rolandis G.*, 232 Ill. 2d 13, 43, 902 N.E.2d 600, 617 (2008).

> "When deciding whether error is harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *Id.*

¶ 98        Judged in accordance with the foregoing standard, we conclude the properly admitted evidence in this record overwhelmingly supports defendant's convictions. As discussed at length above, N.D.'s trial testimony describing the sexual abuse was consistent with the CAC interview, which was properly admitted into evidence pursuant to section 115-10. Moreover, N.D.'s testimony regarding the three prior disclosures was brief:

> "Q. Did you eventually tell anybody?
>
> A. Yes.
>
> Q. Who did you eventually tell?
>
> A. My mom."

N.D. also described her mother's response to these disclosures. The State relied on the testimony only to explain N.D.'s delay in disclosing the abuse to her father and not to generally bolster her credibility or elicit repeated descriptions of the abuse. Given the properly admitted evidence

- 33 -

overwhelmingly supported defendant's conviction, the admission of N.D.'s testimony that she told her mother about the abuse three times was harmless beyond a reasonable doubt.

¶ 99                                    D. Plain Error

¶ 100        Finally, defendant argues his convictions should be reversed under the plain-error doctrine. Specifically, defendant asserts Detective Maas gave improper opinion testimony on defendant's credibility when he testified that defendant "minimized" the amount of alone time he had with N.D. Defendant further asserts the State's closing argument was improper because it (1) minimized its burden of proof and suggested the jury should center on the victim's testimony; (2) inflamed the passions of the jury by playing a clip of N.D. stating defendant destroyed her life; and (3) accused defense counsel of attempting to mislead the jury by using "smoke and mirrors." Finally, defendant asserts the comments in the CAC video regarding defendant's citizenship status and Whitaker's statements that the abuse was not N.D.'s fault and that she felt N.D. had been honest should have been excluded.

¶ 101        "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2 403, 410-11 (2007). The first step in plain-error analysis is to determine whether error occurred. *Id.* at 411.

¶ 102                           1. *Detective Maas's Testimony*

¶ 103          Defendant asserts Detective Maas gave improper opinion testimony on

defendant's credibility when he testified that defendant "minimized" the amount of alone time he

had with N.D.  In support of this argument, defendant relies on *People v. O'Donnell*, 2015 IL

App (4th) 130358, ¶¶ 31-33, 28 N.E.3d 1026, *People v. Henderson*, 394 Ill. App. 3d 747,

753-54, 915 N.E.2d 473, 477-78 (2009), and *People v. Brothers*, 2015 IL App (4th) 130644,

¶ 124, 39 N.E.3d 1101.  In *O'Donnell*, the witness "specifically testified, 'When I would ask

[defendant] about certain things that would reflect him being the driver, he would always look

away from me, or look down ***. *** [I]t's a sign of deception when someone won't look at

you, when they look away to answer you."  *O'Donnell*, 2015 IL App (4th) 130358, ¶ 33.  In

*Henderson*, the State elicited extensive "human lie detector" testimony from the detective.

*Henderson*, 394 Ill. App. 3d at 750-51.  The detective was allowed to testify at trial that the

defendant's vague responses and body language indicated he was being deceptive during his

interrogation and the detective pointed out segments of interview video where he believed the

defendant was lying.  *Id.*  In *Brothers*, the police officer testified the victim was "very believable,

very credible."  *Brothers*, 2015 IL App (4th) 130644, ¶ 124.  We find these cases distinguishable.

Unlike these three cases, Detective Maas did not testify specifically as to defendant's credibility

or truthfulness.  Rather, Maas testified that defendant "minimized" the amount of time he spent

with N.D. by first telling Maas he watched N.D. "only a little bit here and there" and later

explaining "there was a lot bigger amount of time that he watched the kids and [N.D.]"  This

testimony was not a direct commentary on defendant's credibility or truthfulness.

¶ 104          Even if we construe Detective Maas's testimony to be a comment about

defendant's credibility, we conclude any error is harmless.  No reasonable probability exists that

the jury would have acquitted defendant absent Maas's testimony that defendant "minimized"

the time he spent with N.D.  *People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 83, 53 N.E.3d 332 (stating evidentiary issues are harmless where no reasonable probability exists that the jury would have acquitted the defendant absent the error).  Maas specifically testified that defendant initially stated he watched N.D. "only a little bit here and there" and later explained "there was a lot bigger amount of time that he watched the kids and [N.D.]"  That fact itself was suggestive of a consciousness of guilt and Maas's testimony that defendant "minimized" the time spent with N.D. did not add anything new to the information before the jury.

¶ 105                                  2. *Closing Argument*

¶ 106       Defendant further asserts the State's closing argument was improper because it (1) minimized its burden of proof and suggested the jury's evaluation should center on the victim's testimony; (2) inflamed the passions of the jury by playing a clip of N.D. stating defendant destroyed her life; and (3) accused defense counsel of attempting to mislead the jury by using "smoke and mirrors."

¶ 107       During closing argument, prosecutors have wide latitude to comment on all relevant evidence and make any fair and reasonable inferences from that evidence.  *People v. Nicholas*, 218 Ill. 2d 104, 121, 842 N.E.2d 674, 685 (2005).  A closing argument must be viewed in its entirety and any improper remarks must be viewed contextually.  *People v. Blue*, 189 Ill. 2d 99, 128, 724 N.E.2d 920, 935 (2000).  To warrant reversal, improper remarks during closing argument must constitute a material factor in a defendant's conviction.  *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007).  "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted."  *Id.*

¶ 108    First, defendant asserts the State minimized its burden of proof by telling the jury it "should" or "must" find defendant guilty if they believed N.D. The State argues defendant failed to support this argument with citation to authority. We agree. The only case defendant cites in this portion of his argument is *People v. Stevens*, 2018 IL App (4th) 160138, ¶¶ 55-68, 115 N.E.3d 1207. *Stevens* addressed arguments that the State improperly commented on facts outside of the evidence and asked the jury to think of the message an acquittal would send to victims. *Id.* ¶¶ 61, 68. As such, defendant has failed to support his argument regarding the State's comments on its burden of proof with citation to authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Defendant does not address this failure in his reply brief.

¶ 109    Nonetheless, we conclude that defendant has not demonstrated error. In closing argument, the State did not shift the burden to the defendant or minimize its standard of proof. Rather, the State properly argued that, if the jury believed N.D., they should convict defendant of the offenses. As discussed above, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible, even where it is contradicted by the defendant." *Gray*, 2017 IL 120958, ¶ 36. That is exactly what the State argued to the jury: N.D.'s testimony was positive and credible and, therefore, sufficient to convict defendant of the offenses. Moreover, the jury was properly instructed that the State bore the burden of proving defendant guilty beyond a reasonable doubt.

¶ 110    Defendant next asserts the State inflamed the passions of the jury by repeatedly playing a clip of N.D. stating defendant destroyed her life. The State asserts defendant failed to support this argument with citations to the record and the record does not establish the clip was played at all, let alone three times. The State is correct that defendant failed to provide supporting record citation for this argument. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

Additionally, as noted in the statement of facts, the record includes a power point presentation the State apparently relied upon in closing argument, but the record is not clear as to which clips were played or when the clips were played. "The appellant bears the burden of presenting an adequate record to support its claim of error. [Citation.] Any doubts stemming from an inadequate record will be construed against the appellant." *People v. Hunt*, 234 Ill. 2d 49, 58, 914 N.E.2d 477, 481 (2009). As such, the record does not support the argument that the State improperly inflamed the passions the jury.

¶ 111     Next, defendant argues the State accused defense counsel of attempting to mislead the jury by using "smoke and mirrors." Specifically, defendant points to the State's comments that the argument about the 63-day delay in arresting defendant was "a bunch of smoke and mirrors to try to distract you from what did happen in this case," and "[o]ther smoke and mirrors is witnesses that the defense brought before you." In support of this argument, defendant relies on *People v. Kidd*, 147 Ill. 2d 510, 591 N.E.2d 431 (1992). In *Kidd*, the State was permitted to repeatedly and over objection use a smokescreen metaphor to assert defense counsel was intentionally attempting to confuse the jury and divert the jury from the facts in an arson case where 10 children died. *Id.* at 540-41. The State was permitted to make comments such as, "Just as though those ten children ran around lost in the smoke on October 28, 1980, in that building the defense is hoping you will go in the jury room and get lost in the smoke." *Id.* at 541. The State used the smoke metaphor eight times throughout its argument. *Id.* at 544.

¶ 112     Here, the prosecutor's remarks are potentially problematic. However, the State's first comment responded to defense counsel's suggestion that Detective Maas did not arrest defendant for 63 days because he was innocent of the alleged offenses. The State explained the reason defendant's arrest was delayed was because Maas was following procedure. The State's

second comment responded to defense witnesses who testified N.D. did not disclose the abuse to them. The State argued N.D. never had the opportunity to disclose the abuse to Thomas because Thomas was not her teacher and Thomas could not recall having a one-on-one conversation with N.D. The State further argued that the defense witnesses who testified that N.D. did not disclose the abuse to them did not contradict N.D.'s testimony that she never told anyone about the abuse until she told her mother. When we consider the State's closing remarks as a whole, we do not think that the State's comments rise to the level of an improper and impermissible commentary on the integrity of defense counsel. *People v. Glasper*, 234 Ill. 2d 173, 208, 917 N.E.2d 401, 422 (2009). Rather, the comments were directed at the merit and strength of the theory of defense and not direct references to defense counsel and repeated accusations of deceit. *People v. Kirchner*, 194 Ill. 2d 502, 549-51, 743 N.E.2d 94, 119-20 (2000).

¶ 113                                  3. *CAC Interview*

¶ 114          Finally, defendant asserts the comments in the CAC video regarding defendant's citizenship status and Whitaker's statements that the abuse was not N.D.'s fault and that she felt N.D. had been honest should have been excluded. The State asserts defendant failed to properly support this argument with relevant authority and, thus, has forfeited this claim on appeal. *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52, 13 N.E.3d 1216 ("As our appellate court has repeatedly recognized, a reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented." (Internal quotation marks omitted.)). Defendant fails to address the State's forfeiture argument in his reply brief.

¶ 115          Even if defendant had not forfeited this issue, we find no error occurred. Defense counsel did not ask that the video be redacted to exclude these statements. Instead, defense counsel requested admonishments regarding the CAC video, statements Whitaker made about

who was at fault and that she believed N.D., and a statement made about defendant's citizenship status.  Accordingly, the court instructed the jury as follows:

"First would provide, you have before you evidence that [N.D.] made statements concerning the offense charged in this case.  It is for you to determine whether the statements were made and, if so, what weight should be given to the statements.  In making that determination, you should consider the age and maturity of [N.D.], the nature of the statements[,] and the circumstances under which the statements were made.

Statements were also made as to a person's immigration status—or I'm sorry.  Statements were also made as to a person's citizenship status, and a citizen's status is irrelevant and should not be considered by you in any way in arriving at your verdict.

Ladies and gentlemen, you've also just reviewed a video where statements were made by one party as to the truthfulness or believability of another party.  The believability of a party is an issue for you to determine.  And any other person's comment about a witness' believability should not be considered by you in any other way in arriving at your verdict."

¶ 116    Here, the trial court, at defense counsel's request, instructed the jury to disregard the statement regarding defendant's citizenship status and instructed the jury not to consider Whitaker's statements that N.D. was not at fault and that Whitaker believed N.D.  "When, as here, defense counsel affirmatively acquiesces to actions taken by the trial court, a defendant's

- 40 -

only challenge may be presented as a claim for ineffective assistance of counsel on collateral attack." *People v. Dunlap*, 2013 IL App (4th) 110892, ¶ 12, 992 N.E.2d 184. Moreover, "our supreme court has held that statements of past opinions, rather than present ones, do not constitute improper lay opinion testimony." *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 58, 103 N.E.3d 1096. We conclude defense counsel affirmatively acquiesced to the trial court's actions and therefore, no error, let alone plain error, occurred.

¶ 117                                     III. CONCLUSION

¶ 118          For the reasons stated, we affirm the trial court's judgment.

¶ 119          Affirmed.